PEOPLE v YOST

Docket No. 270938. Submitted January 15, 2008, at Lansing. Decided
    March 27, 2008, at 9:15 a.m. Leave to appeal sought.

Donna A. Yost was convicted by a jury in the Bay Circuit Court,
    William J. Caprathe, J., of second-degree murder and first-degree
    felony murder predicated on the underlying felony of first-degree
    child abuse. MCL 750.316, MCL 750.317, and MCL 750.136b(2).
    The charges stemmed from the death of the defendant's seven-
    year-old daughter. She was sentenced to life imprisonment for the
    latter conviction. The defendant appealed.

    The Court of Appeals *held*:

    1. The trial court abused its discretion when it prohibited the
    defendant from eliciting testimony from one of her daughters
    about the defendant's limited intellectual capacities and the effect
    this has on the defendant's communication skills and behaviors.

    2. The trial court erred in preventing the defendant's psy-
    chologist from testifying about the defendant's limited intellectual
    abilities for the purpose of explaining how the limitations might
    explain the previously admitted evidence concerning the defen-
    dant's behaviors and statements. It is more probable than not that
    the error in excluding the testimony of the daughter and the
    psychologist was outcome determinative. The defendant's convic-
    tions must be reversed, her sentence must be vacated, and the
    matter must be remanded for a new trial.

    3. The defendant was not deprived of her right to confront the
    witnesses against her when the prosecution was allowed to admit
    the videotaped testimony of a witness who was unavailable at the
    time of the trial whom the defendant's counsel had effectively
    cross-examined at the time of the witness's testimony.

    4. The trial court denied the defendant a fair trial when it
    prevented the defendant from calling a toxicologist at trial to
    refute the allegation that the defendant had administered a lethal
    dose of medication to her deceased child. The error was not
    harmless and warrants reversal of the convictions and a remand
    for a new trial.

5. The defendant's trial counsel was not ineffective under the facts of this case for failing to request the endorsement of a toxicologist earlier in the proceedings.

6. The trial court clearly erred in determining that the data from references that the defendant's pathologist used to reach certain conclusions were hearsay and did not fall within any recognized hearsay exception. The trial court committed plain error in preventing the pathologist from offering certain testimony involving the drugs found in the body of the defendant's deceased daughter.

7. It was not error to allow the forensic pathologist who conducted an autopsy of the deceased child to testify that it was his opinion that a child of seven does not have the mental maturity to commit suicide. The pathologist was not required to offer data in support of his opinion, which need only be based on the facts admitted into evidence and his general training and experience.

8. The trial court did not err in permitting the prosecution to present evidence of prior drug overdoses by the defendant's children and evidence concerning prior and recent allegations that the child who died had been sexually abused, including information regarding the defendant's experiences with the investigations into the abuse. The trial court erred in permitting the introduction of detailed evidence concerning specific acts of physical abuse the defendant allegedly committed against her children to show malice, intent, or absence of mistake or accident. Although the trial court correctly determined that the evidence that the defendant had been investigated because of the allegations of physical abuse was admissible, the trial court erred in permitting the prosecution to present detailed evidence of the specific instances of abuse.

Convictions reversed, sentence vacated, and case remanded for a new trial.

1. CRIMINAL LAW — EVIDENCE — LACK OF MENTAL CAPACITY.

A defendant may not offer evidence of a lack of mental capacity for the purpose of avoiding or reducing criminal responsibility by negating the intent element of an offense; a defendant may present evidence of limited intellectual capabilities if offered for a relevant purpose other than to negate the intent element of the charged offense.

2. TRIAL — WITNESSES — LATE ENDORSEMENT.

A trial court's decision to permit or deny the late endorsement of a witness is reviewed for an abuse of discretion; a trial court abuses its discretion when its decision falls outside the range of reasonable and principled outcomes.

3. WITNESSES — EXPERT WITNESSES — OPINION TESTIMONY — EVIDENCE.

> An expert may not offer an opinion that is based on facts or data in the particular case unless the facts or data are in evidence or will be in evidence; the facts or data must be specific to the case; facts or data that are not specific to the case and that is relied upon by an expert in rendering an opinion need not be placed in evidence (MRE 703).

4. CRIMINAL LAW — EVIDENCE — OTHER ACTS.

> Other acts must be of the same general category as the charged offense before evidence regarding the other acts can be found to be logically relevant to show intent (MRE 404[b][1]).

*Michael A. Cox*, Attorney General, *Thomas L. Casey*, Solicitor General, *Kurt C. Asbury*, Prosecuting Attorney, and *Martha G. Mettee*, Assistant Prosecuting Attorney, for the people.

State Appellate Defender (by *Gail Rodwan*) for the defendant.

Before: FITZGERALD, P.J., and MARKEY and SMOLENSKI, JJ.

PER CURIAM. Defendant appeals as of right her jury conviction of second-degree murder and first-degree felony murder predicated on an underlying felony of first-degree child abuse. See MCL 750.316, MCL 750.317, and MCL 750.136b(2). On appeal, defendant argues that the trial court committed several errors that deprived her of a fair trial. Defendant contends that the trial court erred when it prevented her from presenting testimony about her limited intellectual functioning and by preventing her from calling an expert toxicologist. Defendant also contends that the trial court violated her right to confront the witnesses against her when it allowed the prosecution to play a videotape of an informant's testimony. Finally, defendant contends that the trial court erred when it permit-

ted the prosecution's medical examiner to offer an opinion that seven-year-old children do not have the maturity to decide to end their own lives and when it permitted the prosecution to elicit testimony about other acts of abuse or neglect by defendant against her children to show that defendant had bad character and acted in conformity with that character. We agree that the trial court should have permitted defendant to present evidence about her limited intellectual functioning, should have allowed defendant to call a toxicologist, and erred when it permitted the prosecution to elicit testimony about defendant's involvement with Child Protective Services without appropriately limiting the nature and the extent of the testimony. Because these errors deprived defendant of a fair trial, we reverse defendant's convictions, vacate her sentence, and remand for a new trial.

### I. NATURE OF THE CASE

This case arises out of the death of defendant's seven-year-old daughter, Monique, on October 10, 1999.[1] On that day, defendant was home alone with Monique. Sometime after 11 a.m., Monique left home without permission. When Monique returned, defendant angrily told her to take a nap on the couch. At around 6 p.m., defendant tried to wake Monique, but Monique did not respond. Shortly thereafter, a couple who lived next door came over to visit. Defendant again tried to wake Monique, but to no avail. When one of the

---

[1] Defendant was arrested just a few months after Monique's death. But the district court originally refused to bind defendant over on the charges for lack of credible evidence of homicide. However, after a lengthy appeal process, see *People v Yost*, 468 Mich 122, 123-125; 659 NW2d 604 (2003), defendant was eventually bound over for trial. Even after being bound over for trial, defendant's trial date was repeatedly delayed. The trial at issue began on February 22, 2006, and ended on April 6, 2006.

neighbors entered the room where Monique was lying, Monique suffered a seizure and stopped breathing. The neighbor began efforts to resuscitate Monique and told his girlfriend to call for help. Emergency personnel arrived shortly thereafter. The emergency personnel immediately transported Monique to the hospital, where she was pronounced dead.

After conducting an autopsy, the medical examiner was not able to determine the cause and the manner of Monique's death. But a blood test later revealed that Monique had a significant amount of Imipramine, an antidepressant drug, in her system. Monique had months earlier been prescribed the Imipramine to control bedwetting and anxiety. On the basis of the level of Imipramine found in Monique's body and the ratio of Imipramine to its metabolite, the medical examiner concluded that Monique died of acute Imipramine poisoning. Further, the medical examiner determined that it would take more than 90 of the pills prescribed to Monique to reach the level of Imipramine found in her system. Because the medical examiner found no pill residue in Monique's stomach, he concluded that the pills must have been dissolved in liquid before Monique ingested them. From this evidence, the medical examiner concluded that Monique's death was a homicide.

The prosecution brought two counts against defendant. The first count was for first-degree premeditated murder and the second count was for felony murder with first-degree child abuse as the underlying felony. The primary issues at trial were (1) whether Monique died from an overdose of Imipramine and, if she did, (2) whether defendant caused Monique to ingest the Imipramine.

The prosecution centered its case on the unlikelihood that Monique would deliberately or accidentally take

such a large overdose of Imipramine along with evidence that defendant had both a motive and the opportunity to cause Monique to ingest the Imipramine. For her defense, defendant presented evidence that Monique had a heart defect that may have caused her death and tried to present evidence that the level of Imipramine found in Monique was not lethal. The defense also suggested that Monique suffered from depression and may have deliberately or accidentally ingested the Imipramine.

After a lengthy trial, the jury found defendant not guilty of premeditated murder under the first count, but convicted defendant of the lesser-included offense of second-degree murder, and found defendant guilty of first-degree felony murder under the second count. The trial court sentenced defendant to life in prison without the possibility of parole for the felony-murder conviction.

This appeal followed.

II. EVIDENCE OF DEFENDANT'S INTELLECTUAL CAPABILITIES

Defendant first argues that the trial court abused its discretion when it prevented defendant's expert psychologist, Dr. Siroza VanHorn, from testifying about defendant's intellectual functioning, cognitive processing, judgment, and problem-solving and parenting abilities. Defendant also contends that the trial court erred when it prevented another daughter of the defendant, Roxanne Davis, from testifying about her mother's limited intellectual capabilities and how these limitations affected defendant's ability to function in the family and react to life situations. We agree that the trial court erred when it prevented VanHorn and Davis from testifying about defendant's limited intellectual capability as a means of shedding light on defendant's behaviors and statements.

A. RELEVANT TRIAL TESTIMONY AND COURT RULINGS

At trial, the prosecution spent a significant portion of its case eliciting testimony about defendant's unnatural reactions and conduct during the events leading up to and surrounding Monique's death and the subsequent investigation. The prosecution used the testimony as proof of motive and consciousness of guilt.

Several witnesses offered testimony that together tended to suggest that defendant had deliberately tried to keep the prosecutor from interviewing Monique as part of an investigation into allegations that a houseguest had sexually abused Monique. Because this behavior was not consistent with how a mother would normally respond to allegations of abuse against her child, it strongly supported the prosecution's theory that defendant had an ulterior motive to prevent Monique from participating in the investigation.

The prosecution also elicited testimony from medical personnel and persons who attended Monique's funeral that defendant's reaction to her daughter's death was inconsistent with that of an innocent mother who had lost a child.

One of the paramedics who responded to the Yost home testified that defendant was unemotional and that, after she told defendant that her daughter was in grave condition, defendant merely responded, "okay." This was in contrast to defendant's husband, who was "pretty emotional; he was crying." The paramedic also noted that defendant declined an invitation to ride in the ambulance with Monique. Another paramedic testified that defendant's reaction was "odd." He said that defendant answered all his questions, but that she was "unemotional" and that this was not "something I typically see . . . when we have a sick child."

A nurse at the hospital where Monique was treated testified that defendant turned her emotions on and off at will. She explained that when she entered the room and made eye contact with defendant, defendant would cry and exclaim "my baby, my baby." But that when she left the room, defendant would immediately stop crying and become unemotional.

Likewise, Monique's family therapist testified that she went to Monique's funeral and observed that defendant had an unusual demeanor: she appeared nervous.

In addition, the prosecution made effective use of several recorded statements of conversations between defendant and the officers investigating Monique's death. In these conversations, defendant made seemingly odd statements about Monique's death and the events surrounding the investigation. These statements suggested that defendant had a guilty conscience or was, at the least, apathetic about her daughter's death. In addition to these recordings, two officers testified about defendant's reactions to their investigation into Monique's death.

Amado Arceo, who was an officer of the Michigan State Police, testified that defendant said she felt "responsible" for Monique's death and that she deserved a second chance. He also testified that he asked defendant about the worst thing that ever happened to her and defendant responded, "Two weeks ago, I was in jail, and Monique lying to everybody."

Detective Dean Vosler also testified that defendant's reactions were odd. He stated that the only time defendant showed any emotion about her daughter was when she described being angry with her. Vosler explained:

> I never noticed in any of the interviews with [defendant] that she cried from—over Monique's death. She cried because she thought she was in trouble. She told me how it

was hard for Lonnie and Josh and Jessica, Monique's death, but she never even told me it was hard for her. It didn't appear to me that she felt any sorrow for her.

Vosler also said that defendant told him that she did not mean to kill her daughter and that she should have watched her more closely.

As an alternative explanation for defendant's seemingly odd behaviors and comments, defendant's trial counsel wanted to present expert testimony about defendant's limited intellectual capabilities. Indeed, during opening arguments, defendant's attorney noted that defendant was mentally challenged and argued that, because of her limitations, defendant appeared confused and could be easily manipulated into making apparently incriminating statements. Defendant's trial counsel stated that a psychologist would testify about defendant's limited intellectual capacity and explain how it affected defendant's ability to communicate.

However, on March 21, 2006, which was after the start of the trial, the prosecution moved in limine to prevent defendant from eliciting testimony that defendant had "diminished capacity." Specifically, the prosecution argued that defendant was improperly attempting to put forth evidence that she could not form the requisite intent to commit the charged crimes and improperly attempting to argue that defendant's statements to the police were not voluntary. The trial court addressed the motion before taking testimony on March 23.

Defendant's trial counsel denied that he was presenting a diminished-capacity defense. He explained that he was not attempting to show that defendant lacked the mental capacity to form the requisite intent to commit the charged offenses. Rather, he stated that the sole defense was that defendant did not commit the charged offenses.

Defendant's trial counsel also denied that any testimony about defendant's limited intellectual capabilities would be offered to challenge the voluntary nature of defendant's interviews with the police or to bolster defendant's credibility. Defendant's trial counsel stated that he wanted to offer evidence concerning defendant's intellectual functioning, cognitive processing, judgment, and problem-solving and parenting abilities, which were placed at issue by the prosecution's proofs. The purpose of the testimony, he contended, was to "put into context and explain" the evidence offered by the prosecution in these areas. Defendant argued that evidence of defendant's limitations would help the jury understand how defendant displayed her emotions and why she would not ask a neighbor to assist with transportation issues, and would also explain the context of statements that appear to be untruthful or indicate a sense of responsibility for Monique's death.

Defendant's trial counsel also argued that the jury needed this evidence to understand the context of defendant's statements to the police. Specifically, he contended that the interrogating officers could easily manipulate defendant into making statements that made her look guilty. Defendant's trial counsel also stated that this evidence would help the jury understand the context underlying the testimony about defendant's involvement with protective services personnel and the statements by the various caseworkers with whom she was involved. He explained that the evidence would "explain why she said what she did, or the way she said it, or how she said it, and put[] it into context why some people either misunderstood statements or why someone [who] was functioning at a second grade level would act in a certain way or talk in a certain way."

At the close of these arguments, the trial court indicated that there were four areas that defendant's expert clearly could not go into: the trial court precluded the defense from (1) offering a diminished-capacity defense, (2) arguing that defendant's statements to the police were not voluntary, (3) using the evidence to bolster defendant's credibility, and (4) using the evidence to argue innocence. Notwithstanding this, the trial court recognized that the testimony might be relevant for purposes other than those four areas. But, rather than rule immediately, the trial court stated that it would deal with those issues as they came up outside the presence of the jury and would create a separate record if necessary.

After trial resumed, the defense called Davis. Defendant's trial counsel tried to elicit testimony from Davis concerning her mother's abilities to plan and communicate with others, but the trial court sustained the prosecution's objections to these questions. After the trial court excused the jury, defendant's trial counsel indicated that he wanted to elicit testimony from Davis concerning her mother's lack of communication skills and lack of emotion. He also indicated that he wanted to ask Davis if she thought her mother was capable of killing Monique. Defendant's trial counsel indicated that he thought Davis could properly testify about whether defendant had the intelligence to plan the murder, execute the plan, and then cover it up.

The trial court specifically precluded defendant from presenting any evidence that defendant did not have the intelligence to carry out the murder. It also prohibited the witness from testifying about defendant's lack of communication skills or about abnormal behavior resulting from defendant's slowness because "that is going to deal with diminished capacity." And it further

ruled that, even if the evidence was relevant for a proper purpose, the relevance was outweighed by its prejudicial value.

After Davis testified, defendant's trial counsel called VanHorn as an expert psychologist for a separate record. Notwithstanding the fact that the testimony was part of a separate record, the prosecution objected on the grounds that any opinion that VanHorn had must have been formed on the basis of inadmissible hearsay statements and, therefore, that she would not be able to offer an opinion under MRE 703. The trial court ruled that the witness could not testify about anything that defendant told her.

VanHorn then began to explain that she had performed a mental-status examination of defendant. The prosecutor again objected on the ground that the examination was based on inadmissible hearsay. The court sustained the objection. Defendant's trial counsel then asked the witness if all the tests that she administered required input from defendant, to which she replied, "yes." VanHorn stated that she used the tests, some personal history, and defendant's records. The trial court again sustained the prosecution's objection on hearsay grounds. After this ruling, defendant's trial counsel responded, "Then I guess we won't be using her as a witness, Judge, because the State—you—you know, has basically cut it—gutted it out."

The defense proceeded to call a different witness, who testified for approximately 23 minutes. Sometime after this witness testified, defendant's trial counsel indicated that he wanted to clarify that during Van-Horn's testimony he was relying on MRE 803(4) for the admissibility of defendant's statements to VanHorn. The trial court indicated that defendant failed to lay a foundation for the admission of the statements based

on medical treatment and had waived the issue by not raising it earlier. The trial court further indicated that defendant's statements would not be admissible if the statements were not made for the purpose of treatment.

### B. ANALYSIS

#### 1. STANDARD OF REVIEW

A trial court's evidentiary decisions are reviewed for an abuse of discretion. *People v Martin*, 271 Mich App 280, 315; 721 NW2d 815 (2006). "However, whether a rule or statute precludes admission of evidence is a matter of law and is reviewed de novo." *Id.* A trial court abuses its discretion when it selects an outcome that does not fall within the range of reasonable and principled outcomes. *People v Young*, 276 Mich App 446, 448; 740 NW2d 347 (2007). However, it is necessarily an abuse of discretion to admit evidence that is inadmissible as a matter of law. *Martin, supra* at 315.

#### 2. DIMINISHED-CAPACITY DEFENSE

As already noted, the trial court ruled that defendant could not elicit testimony from Davis concerning defendant's limited intellectual capabilities because that evidence pertained to a diminished-capacity defense. Likewise, with regard to VanHorn's testimony, the prosecution argues on appeal that defendant improperly tried to present a diminished-capacity defense through VanHorn's testimony. Therefore, as a preliminary matter, we will first examine whether, and to what extent, evidence tending to demonstrate that a defendant has limited intellectual functioning may still be admitted at trial after the abolition of the diminished-capacity defense.

In *People v Carpenter*, 464 Mich 223; 627 NW2d 276 (2001), our Supreme Court addressed the continuing validity of the diminished-capacity defense in Michigan. Before the decision in *Carpenter*, a defendant who was otherwise legally sane could present evidence of some mental abnormality to negate the specific intent required to commit a particular crime. *Id.* at 232. The Court noted that the theory underlying the diminished-capacity defense was that a defendant with a mental defect that prevented the defendant from forming the specific intent necessary to commit the crime could only be convicted of a lesser offense not requiring that particular mental element. *Id.*

In examining the continued viability of that defense, our Supreme Court observed that the Legislature had enacted a comprehensive statutory scheme concerning defenses based on either mental illness or mental retardation. *Id.* at 230-232, 236. The enactment of this scheme, our Supreme Court concluded, demonstrated the Legislature's "intent to preclude the use of *any* evidence of a defendant's lack of mental capacity short of legal insanity to avoid or reduce criminal responsibility by negating specific intent." *Id.* at 236 (emphasis in original). For this reason, the Court held that the defense of diminished capacity was no longer viable after the enactment of the statutory scheme. *Id.* at 241.

The key component of the diminished-capacity defense is the evidence that the defendant could not form the requisite intent to commit the crime. *Id.* at 232. That is, the defense is an attempt to avoid or reduce criminal responsibility for a particular offense on the basis of the lack of mental capacity to form the specific intent required as an element of the offense. *Id.* at 241. Hence, a defendant is not entitled to offer evidence of a lack of mental capacity for the purpose of avoiding or

reducing criminal responsibility by negating the intent element of an offense. But this does not mean that a defendant who is legally sane can never present evidence that he or she is afflicted with a mental disorder or otherwise has limited mental capabilities.

Relevant evidence is generally admissible, except as provided by the United States and Michigan constitutions and other rules. *People v Sabin (After Remand)*, 463 Mich 43, 56; 614 NW2d 888 (2000), citing MRE 402. Because our Supreme Court has determined that a defendant may not present evidence of diminished mental capacity for the purpose of negating specific intent, the trial court could properly exclude evidence of defendant's mental limitations offered for that purpose. *Carpenter, supra* at 236. However, "[t]hat our Rules of Evidence preclude the use of evidence for one purpose simply does not render the evidence inadmissible for other purposes. Rather, the evidence is admissible for a proper purpose, subject to a limiting instruction under MRE 105." *Sabin, supra* at 56. Therefore, defendant could present evidence of her limited intellectual capabilities if offered for a relevant purpose other than to negate the specific intent element of the charged crimes. See, e.g., *People v Manser*, 250 Mich App 21, 33; 645 NW2d 65 (2002) (noting that our Supreme Court has held that expert testimony can be relevant and helpful to explain a specific behavior that might otherwise be misconstrued by the jury).

Relevant evidence is evidence "having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." MRE 401. Although a defendant may no longer present evidence of diminished capacity to negate the intent element of a crime, there are circumstances where a

defendant's mental capacity may make a fact that is of consequence to the determination of the action more or less probable without such evidence being offered to negate the specific-intent element of the charged offense.

For example, it is well settled that identity is an element of every offense. *People v Oliphant*, 399 Mich 472, 489; 250 NW2d 443 (1976); *People v Kern*, 6 Mich App 406, 409; 149 NW2d 216 (1967). And, therefore, where identity is in dispute, a defendant may properly present evidence concerning his or her mental capacity that tends to make it less probable that the defendant has been accurately identified as the perpetrator of the crime. Thus, where an offense involved such complicated and specific actions that it could only have been committed by a person with very high intelligence, a defendant could properly submit evidence that he or she had below-average intelligence because that evidence would tend to make it less probable that the defendant was the perpetrator of the crime. Similarly, if the crime at issue was committed in an elevator, a defendant could properly submit evidence that he or she has a pathological fear of elevators. Again, such evidence would involve the defendant's mental faculties, but would not be offered to negate specific intent. Rather, it would be offered as evidence that the defendant was less likely to be the perpetrator of the crime.

In the present case, the prosecution's theory was that defendant caused Monique to ingest an overdose of Imipramine. However, there was no direct physical evidence or eyewitness testimony that connected defendant to Monique's ingestion of the Imipramine. Further, although the prosecution presented evidence that tended to prove that defendant had both a motive and the opportunity to kill Monique, this evidence was not

particularly compelling and did not negate the possibility that Monique either accidentally or deliberately took an overdose of the medication. As a result, one of the key questions at trial was whether Monique ingested the Imipramine on her own, resulting in either a deliberate or accidental overdose, or whether defendant caused Monique to ingest the Imipramine. For this reason, the circumstances, timing, and context surrounding defendant's statements and actions became highly relevant to determining whether defendant caused Monique to ingest the Imipramine and, if she did, what defendant's state of mind was at the time. Indeed, the prosecution relied heavily on testimony concerning defendant's statements and actions from both before and after Monique's death, which suggested that defendant was attempting to cover up her involvement in Monique's death or otherwise had a guilty conscience.

In response to the prosecution's evidence, defendant's trial counsel attempted to show that defendant's statements and actions were not evidence of guilt when understood in light of her limited education and intellectual capabilities. Likewise, defendant's trial counsel wanted to present evidence that a person of defendant's intellect is easily manipulated into making statements that might appear to reflect a guilty conscience. Defendant's trial counsel did not propose to use the evidence of defendant's limited mental faculties to negate the intent element of the charged offenses. Rather, defendant's trial counsel wanted to place defendant's statements in context so that the jury could fully and fairly determine whether defendant's statements and actions were truly indicative of a guilty conscience or were merely misinterpreted by the listeners and observers who witnessed the statements and actions. Therefore, to the extent that this evidence was offered for a

purpose other than to negate the intent element of the charged offenses, the evidence was not barred by the rule stated in *Carpenter, supra,* even though it dealt with defendant's limited mental capacity. See *Sabin, supra* at 56.

### 3. DAVIS'S LAY TESTIMONY

At trial, defendant's counsel attempted to ask defendant's daughter Roxanne Davis about her opinion of defendant's ability to plan and about her mother's communication skills. After the jury was excused, the trial court admonished the witness that she may not "in any way imply or give any indication that you think that your mother's not capable of committing this offense." The trial court also ruled that defendant's trial counsel would not be permitted to elicit testimony from Davis concerning defendant's communication skills. The trial court explained that such testimony is impermissible diminished-capacity evidence. Finally, the trial court indicated that defendant's trial counsel would not be permitted to elicit testimony that defendant's behavior was "out of norm because of her slowness." The trial court did permit defendant's counsel to elicit testimony about defendant's reactions to Monique's death that were actually observed by Davis. Thereafter, defendant's counsel did not attempt to elicit testimony of this nature.

Under MRE 701, a witness who is not testifying as an expert may only testify in the form of opinions or inferences that are "(a) rationally based on the perception of the witness and (b) helpful to a clear understanding of the witness' testimony or the determination of a fact in issue." Davis's testimony established that, given her own perceptions of defendant, she had the ability to offer testimony and an opinion about her mother's

ability to plan ahead, her mother's communication skills, and how her mother's intellectual limitations affected her mother's behavior. Further, this testimony would have been helpful for the jury in determining whether the statements and behavior offered into evidence by the prosecution were inconsistent with innocence. Hence, this testimony met the requirements of MRE 701.

Notwithstanding that the requirements of MRE 701 were met, defendant's trial counsel did not establish that the charged offense required any particular level of intelligence to carry out. As a result, the relevance of any testimony by Davis concerning whether her mother was intelligent enough to carry out the actions necessary to commit the crime was at best marginal. Likewise, defendant's trial counsel's question about whether defendant was the type of person who "would plan things out or act on the moment," implicated whether defendant was mentally capable of premeditation. Therefore, the trial court properly prevented testimony of this nature as both likely offered to improperly negate the intent element of the charged offenses and, to the extent that it had marginal relevance, because its probative value was substantially outweighed by the danger of unfair prejudice. MRE 403.

Davis could, however, properly testify about defendant's poor communication skills and how defendant's behavior might seem unusual because of her "slowness" without running afoul of the rule stated in *Carpenter*. Additionally, this evidence was not substantially outweighed by unfair prejudice to the prosecution. Any unfair prejudice could have been dealt with by the trial court's instructing the jury that it could only use the testimony to further its understanding of defendant's statements and behavior. See MRE 105. Because

this testimony was particularly relevant to the facts of this case and not substantially outweighed by unfair prejudice, the trial court's decision to prevent defendant from eliciting this testimony fell outside the range of reasonable and principled outcomes. *Young, supra* at 448. Consequently, the trial court abused its discretion when it prohibited defendant from eliciting testimony from Davis about defendant's communication skills and behavior.

### 4. VANHORN'S EXPERT TESTIMONY

#### a. PRESERVATION

As a preliminary matter, we will first address whether defendant properly preserved this issue before the trial court.

After the trial court's earlier ruling on the prosecution's motion to prevent defendant from offering a diminished-capacity defense, defendant's trial counsel called VanHorn to the stand outside the presence of the jury to create a separate record of her testimony. Defendant's trial counsel then proceeded to ask questions of the witness. The prosecution repeatedly objected on the basis of hearsay. And the trial court sustained each objection. Indeed, the trial court would not even permit the defense to create a separate record of VanHorn's testimony for evaluation by this Court. After this, defendant's trial counsel elicited testimony from VanHorn that clarified that her opinion would be based entirely on defendant's records, defendant's self-reported background information, and tests that relied on defendant's responses to questions. The prosecution again objected on the basis of hearsay, and the trial court sustained the objection. Thereafter, defendant's trial counsel abandoned further questioning of the witness.

Although it does not appear from this isolated portion of the record that the trial court completely barred defendant from using this witness, the trial court's rulings with regard to VanHorn must be examined in light of the trial court's earlier rulings on expert testimony.

On March 21, the defense called Lisa Gano. Gano testified that she had a masters degree in social work and had evaluated Monique for special-education purposes and helped create Monique's individualized education program. During the course of Gano's testimony, the defense tried to admit records generated as part of Gano's evaluation. The prosecution objected that the records contained statements by Monique, teachers, and others who took part in evaluating Monique. The court initially ruled that Gano could not testify about anything anyone told her and could not offer a "conclusion that would be drawn from these things . . . ." Thereafter, Gano was only permitted to testify about her conclusions to the extent that the conclusions were based solely on her own observations of Monique.

After a time, defendant's trial counsel noted that Gano should be allowed to base her opinion on hearsay statements because the statements were made in furtherance of Monique's diagnosis and treatment. The next day, the court determined that Gano could testify about, and base her conclusions on, statements by Monique and Monique's answers to test questions. But the trial court prohibited the witness from testifying about any statements made by defendant and precluded any opinion testimony to the extent that the testimony was based on statements by Monique's teachers or defendant. Hence, the trial court eventually permitted the expert witness to testify about and render an

opinion based on hearsay, but only to the extent that the hearsay involved statements by Monique.[2]

Unlike the case with Gano, who diagnosed Monique for treatment purposes, the defense retained VanHorn two years before trial to evaluate defendant. For this reason, the defense could not rely on MRE 803(4) for the admission of defendant's statements to VanHorn or the admission of defendant's responses to questions asked as part of diagnostic tests. Consequently, in light of the trial court's previous rulings with regard to expert testimony, it was evident that the trial court's hearsay rulings effectively barred VanHorn from offering an opinion on defendant's limited intellectual functioning. And defendant's trial counsel cannot be faulted for not taking further steps to convince the trial court that the expert should be permitted to testify—he took all the steps reasonably necessary to preserve this issue for appeal.

b. ANALYSIS

Under MRE 703, the "facts or data in the particular case upon which an expert bases an opinion or inference" must be in evidence. Hence, in order for VanHorn to offer an opinion that defendant had limited intellec-

---

[2] Although the propriety of this ruling is not now before us, we note that it was plainly erroneous. The hearsay exception stated in MRE 803(4) is not limited to statements made by the person being diagnosed or treated. Rather, the rule specifically permits any "[s]tatements made for purposes of medical treatment or medical diagnosis in connection with treatment . . . insofar as reasonably necessary to such diagnosis and treatment." Hence, the witness should have been permitted to rely on statements by third parties, such as Monique's parents and teachers. MRE 803(4); see, e.g., *Merrow v Bofferding*, 458 Mich 617, 624, 628-630; 581 NW2d 696 (1998) (upholding the admission of a statement in a patient's medical history regarding the cause of an injury even though the medical personnel could not identify the person who provided the history).

tual capabilities, VanHorn's opinion had to be based on facts or data in evidence. By separate record, the defense established that VanHorn's opinion was based on defendant's statements about her background and history, on defendant's answers to psychological testing, and on records of defendant's prior treatment, as well as the treatment received by defendant's children. Therefore, before VanHorn could render her opinion, defendant had to demonstrate that the background statements, tests, and previous records, which VanHorn relied on to form her opinion about defendant's limited intellectual abilities, were admissible. At trial, the trial court summarily sustained the prosecution's objections based on hearsay. Consequently, whether the trial court erred depends on whether it properly excluded the evidence underlying VanHorn's opinion on hearsay grounds.

Hearsay is generally inadmissible. MRE 802. Hearsay is a "statement, other than the one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." MRE 801(c).

Although VanHorn indicated that she relied on defendant's statements concerning her background and defendant's responses during testing, the mere fact that VanHorn relied on these statements does not necessarily mean that defendant had to offer the statements to prove the truth of the matters asserted. VanHorn may very well have been able to evaluate defendant's intellectual functioning on the basis of defendant's answers regardless of the veracity of those answers. For this reason, the defense could have offered the statements solely to clarify the basis of VanHorn's conclusions about defendant's intellectual abilities. Indeed, our Supreme Court has recognized that statements to a

mental-health professional by a patient are often valuable for evaluation without regard to their truth. See *People v Beckley*, 434 Mich 691, 728; 456 NW2d 391 (1990) (opinion by BRICKLEY, J.) (noting that mental-health professionals generally only receive information from the patient and that they start "with the basic assumption that the history they receive is what the patient believes to be the truth, not necessarily what actually is the truth"). Thus, the fact that the tests VanHorn performed on defendant reflect defendant's answers does not necessarily require a conclusion that the tests or the answers were inadmissible hearsay.

Likewise, VanHorn may have been able to use the background information for evaluation without regard to the truth of the statements concerning defendant's background. Therefore, to the extent that the tests and background information were not offered to prove the truth of the assertions made as part of the test or the truth of the background information, the tests and background information were not hearsay and the trial court erred in excluding them on this basis. MRE 801(c).

Furthermore, to the extent that the tests could be undermined by answers designed to skew the results, that possibility is a matter that goes to the weight of VanHorn's opinion, which the prosecution could have pursued on cross-examination or through its own expert. In order to reduce prejudice, the trial court could also have instructed defendant's trial counsel to limit his questions to eliciting testimony from VanHorn that she performed tests and that the tests were based on defendant's responses without getting into the details of the responses. The same could have been done for the background information.

To the extent that VanHorn's opinion was based on previous records, those records likely were admissible under a hearsay exception. VanHorn stated that she evaluated records that pertained to the prior treatment of defendant's children and defendant. The records themselves were likely admissible as records of regularly conducted activity. MRE 803(6). In addition, the statements within the records were likely admissible as statements made for the purpose of medical treatment or diagnosis in connection with treatment. MRE 803(4).

Because the evidence relied on by VanHorn was likely not hearsay or was admissible under a hearsay exception, the trial court's decision to prevent VanHorn from offering an opinion about defendant's limited faculties on the basis that this evidence was inadmissible fell outside the range of reasonable and principled outcomes. *Young, supra* at 448. The trial court erroneously deprived defendant of the opportunity to present expert testimony about her limited intellectual abilities for the purpose of explaining how the limitations might explain the previously admitted evidence concerning defendant's behaviors and statements.

### C. CONCLUSION

The trial court abused its discretion when it prevented Davis from testifying about defendant's poor communication skills and behavior and how they might seem unusual because of her "slowness." The trial court also abused its discretion when it prevented defendant's psychologist from testifying about her conclusions regarding defendant's limited intellectual functioning and how that functioning might have affected defendant's communication skills and behavior. Finally, because a significant portion of the prosecution's case rested on defendant's reactions to the events surround-

ing her daughter's death and to statements made by defendant, which could not be fully evaluated by the jury without understanding defendant's intellectual limitations, we conclude that it is more probable than not that the error was outcome determinative. *People v Lukity*, 460 Mich 484, 495-496; 596 NW2d 607 (1999).[3] Consequently, defendant is entitled to a new trial on the basis of these errors. Further, although these errors warrant reversal of defendant's convictions and vacation of her sentence, because each of defendant's remaining claims of error are likely to arise again on retrial, we shall address them.

### III. RIGHT TO CONFRONT WITNESSES

Defendant next argues that the trial court deprived her of her right to confront the witnesses against her when it admitted the 2004 special hearing testimony of Marisol Sarmiento, who served time in jail with defendant shortly after her arrest. Defendant notes that, although Sarmiento testified under oath before the trial court and defendant's trial counsel had the opportunity to cross-examine Sarmiento, defendant's trial counsel did not have all the information necessary to effectively cross-examine Sarmiento in 2004. Specifically, defen-

---

[3] During closing arguments the prosecution repeatedly and vigorously argued that defendant's unusual behavior and statements were clear evidence of guilt. The prosecution noted that, although defendant supposedly was not aware that something was wrong with Monique when she failed to get up from her nap, the neighbor immediately knew something was wrong and began to help. The prosecutor also noted that defendant refused to get into the ambulance and argued that defendant stopped crying when the nurse left the room at the hospital because there were "no more witnesses." The prosecutor also played excerpts of defendant's recorded statements during closing arguments to punctuate the prosecution's claims that defendant deliberately killed Monique to punish and silence her. The powerful emotive effect of this use of defendant's recorded statements was evident even in the transcription.

dant claims that her trial counsel did not have the benefit of the testimony made by two additional inmate informants who testified at trial. Had defendant's trial counsel had this information, defendant contends, he could have questioned Sarmiento about the inconsistencies between the statements that defendant allegedly made to Sarmiento in jail and the versions that the other inmates testified about at trial. Defendant claims that because Sarmiento's testimony likely affected the outcome of the trial, her conviction must be reversed on this basis. We disagree.

### A. PROCEDURAL HISTORY AND RELEVANT TESTIMONY

In 2004 the prosecution moved for permission to preserve the testimony of Sarmiento by videotape in lieu of in-court testimony. The trial court held a hearing on the motion on August 24, 2004. At the hearing, the prosecution noted that Sarmiento had been incarcerated first in California and later in Washington, but was brought to Michigan under a material-witness warrant. The prosecution also noted that defendant had moved for an adjournment of the trial. And because Sarmiento was going to be deported, the prosecution argued that, rather than hold her until the trial, the prosecution should be permitted to preserve her testimony on the record at the hearing and later use it at trial. Although defendant's trial counsel recognized that Sarmiento was to be deported immediately after the hearing, he nevertheless objected to the preservation of her testimony. Defendant's trial counsel objected on the basis that he had not been given enough time to prepare and indicated that he might be prejudiced by the inability to use information on cross-examination that might only become available later.

After hearing the arguments, the trial court concluded that it was appropriate to take Sarmiento's testimony at the special hearing. The trial court found that defendant had had enough time to prepare. The trial court also rejected defendant's argument that it might not be fair to use the testimony at trial. The trial court explained:

> If something comes up between now and—and then, the Court certainly would take that into consideration in determining whether or not that should be admitted to reflect upon that testimony, or even would take that into consideration in the argument that that testimony should be precluded that we've taken today.
>
> But I can't anticipate that at this point and would reserve my ruling until such circumstances should arise and the law be presented with respect thereto.

During the hearing, Sarmiento testified under direct examination that she met defendant in jail in early 2000. She stated that defendant told her that Monique was on medication for bed-wetting and that she kept the medicine on a high shelf. Sarmiento also testified that defendant told her that on the day of Monique's death, Monique had run off and later came home. "And she [defendant] told her [Monique] to take a nap and she gave her a drink, and she put her medication [in] that drink. And she went to sleep; and, later on, she went to check up on her, and she didn't respond."

On cross-examination, defendant's trial counsel elicited testimony that Sarmiento had been incarcerated and was to be deported as part of the sentence for a federal conviction. Defendant's trial counsel also questioned Sarmiento about whether she had seen newspaper articles about the case while incarcerated with defendant. Sarmiento testified that she did not remember any articles. Sarmiento also testified that defendant

said that she could not understand how her daughter got the medication and said that she didn't really know what happened to her daughter. She also admitted that defendant stated that she did not have anything to do with her daughter's death. Sarmiento also testified that there was no one else listening in on that conversation.

On recross-examination, defendant's trial counsel attempted to get Sarmiento to acknowledge that defendant had told her that she was *accused* of putting medicine in her daughter's drink, but that she did not in fact do so. However, Sarmiento reiterated that defendant told her that she placed medicine in her daughter's drink. Sarmiento did acknowledge that before her conversation with defendant, she knew that defendant was accused of killing her daughter by placing medicine in her drink. Sarmiento testified that she never came to the police with this information because defendant told her she did not kill her daughter and she (Sarmiento) assumed that defendant merely placed the bed-wetting medicine in her daughter's drink. Finally, Sarmiento testified that defendant showed no remorse and never cried or talked nice about her daughter.

At trial, defendant's trial counsel objected to the admission of Sarmiento's videotaped testimony on the ground that it violated defendant's right to confront the witnesses against her. Specifically, defendant's trial counsel raised the fact that he could not cross-examine Sarmiento on the basis of the actual testimony of the other inmates. However, the trial court determined that defendant did have a full opportunity to cross-examine Sarmiento and overruled the objection.

### B. ANALYSIS

A defendant has the right to be confronted with the witnesses against him or her. US Const, Am VI; Const

1963, art 1, § 20; *Crawford v Washington*, 541 US 36, 42; 124 S Ct 1354; 158 L Ed 2d 177 (2004). " 'The right of confrontation insures that the witness testifies under oath at trial, is available for cross-examination, and allows the jury to observe the demeanor of the witness.' " *People v Watson*, 245 Mich App 572, 584; 629 NW2d 411 (2001), quoting *People v Frazier (After Remand)*, 446 Mich 539, 543; 521 NW2d 291 (1994) (opinion by BRICKLEY, J.). The Sixth Amendment bars testimonial statements by a witness who does not appear at trial unless the witness is unavailable and the defendant had a prior opportunity to cross-examine the witness. *Crawford, supra* at 53-54. A witness is considered unavailable if he or she is "absent from the hearing and the proponent of a statement has been unable to procure the declarant's attendance . . . by process or other reasonable means, and in. a criminal case, due diligence is shown." MRE 804(a)(5). On appeal, defendant has not challenged the unavailability of Sarmiento or the prosecution's due diligence. Hence, the only question is whether defendant had a prior opportunity to effectively cross-examine Sarmiento. *Crawford, supra* at 53-54.

Defendant acknowledges that her trial counsel was present at the motion hearing at which the trial court ordered the preservation of Sarmiento's testimony and had the opportunity to cross-examine Sarmiento. Nevertheless, defendant contends that the cross-examination was not constitutionally adequate because it did not include information that only became available after the cross-examination. We disagree.

Defendant argues that, had her trial counsel known about the differences between Sarmiento's statements and the testimony of two jail inmates who testified about statements purportedly made by defendant, he

would have been able to more effectively cross-examine Sarmiento about her version of defendant's statements. However, Sarmiento testified that defendant had told her about the events of the day of Monique's death when no one else was listening—and neither of the other witnesses indicated that they overheard defendant's conversation with Sarmiento. Hence, it is difficult to see how defendant could have impeached Sarmiento's testimony with knowledge of the specific details of the other witnesses' testimony. Indeed, the similarities largely outweighed the differences. Further, defendant's trial counsel effectively cross-examined Sarmiento about the statements defendant allegedly made and suggested that Sarmiento's recollection was inaccurate. Specifically, he interjected the possibility that Sarmiento may be misremembering the statement and that, in fact, defendant merely told her that she was *accused* of having given her daughter medicine in a drink. He also asked Sarmiento about the possibility that she learned that defendant had placed medicine in her daughter's drink from newspaper articles. Finally, defendant's trial counsel elicited testimony from Sarmiento that defendant had denied causing her daughter's death. Thus, on the whole, defendant's trial counsel properly and effectively cross-examined Sarmiento on all the relevant issues. Therefore, the trial court did not deprive defendant of her right to confront Sarmiento by permitting the prosecution to admit Sarmiento's videotaped testimony.

## IV. DEFENDANT'S EXPERT TOXICOLOGIST

Defendant next argues that the trial court denied her a fair trial when it prevented her from calling a different toxicologist after the prosecutor refused to agree to allow defendant's originally proposed toxicologist to

testify. We agree that the trial court abused its discretion when it prevented defendant from calling a toxicologist at trial. Because this error was not harmless, defendant is entitled to a new trial.

## A. PROCEDURAL BACKGROUND AND RELEVANT TESTIMONY

In order to properly evaluate the propriety of the trial court's decision to prohibit defendant from calling a toxicologist, it will be necessary to examine the trial court's earlier rulings on the addition of witnesses. Further, because the prejudicial effect of this ruling is inextricably tied to defendant's ability to present similar evidence through her pathologist, it will be necessary to examine the trial court's decision to limit the testimony of defendant's pathologist.

### 1. PRETRIAL RULINGS

After a hearing held on January 24, 2005, the trial court ordered defendant's trial counsel to file an amended witness list within seven days. On the order, the court noted that defendant's trial counsel was looking for a new forensic pathologist because the previously proposed pathologist had moved to Arizona. On February 1, 2005, defendant filed the amended witness list.

On February 16, 2005, defendant's trial counsel moved to adjourn the trial, which had been scheduled to begin that day, in order to review the jury questionnaires. The trial court held a hearing on the motion. At the hearing, the trial court indicated that the prosecutor had also orally requested a motion to adjourn the trial date for 30 days in order to investigate an undisclosed matter and schedule a status conference. On the basis of the total circumstances, the trial court con-

cluded that the trial should be adjourned. At this point, the prosecution indicated that defendant had submitted several new witness lists, which included defendant's new pathologist, Dr. Stephen Cohle. In light of these additions, the prosecution asked the court to order defendant to add new witnesses only by motion and at least 30 days before trial.

After the hearing, the trial court signed a document labeled "Action in Court." Under the heading "Notes/Further Orders," the trial court ordered the adjournment of the trial date, set the date for a status conference, and ordered the parties to submit updated witness lists by February 18, 2005. In addition, there was a marginal notation written perpendicularly to the notes, which read: "Add. witnesses to be handled by motion."

On March 2, 2005, defendant's trial counsel filed an amendment to his February 1, 2005, witness list, which added Cohle as an expert witness. Defendant's trial counsel did not move for the addition of Cohle.[4]

### 2. TRIAL RULINGS

On February 21, 2006, which was the day before the start of the present trial, defendant's trial counsel officially moved for the addition of Cohle to the witness list and also asked that the court permit the addition of Dr. Bernie Eisenga as an expert toxicologist. In his motion, defendant's trial counsel explained that he had forgotten that witnesses could only be added with the

---

[4] Given the prosecutor's statements at the February 16, 2005, hearing, it is clear that defendant added Cohle as a witness before the trial court ordered defendant to add witnesses by motion only. Nevertheless, defendant apparently failed to add Cohle to her final witness list, and the prosecution vigorously opposed defendant's efforts to have Cohle testify at trial.

permission of the court and only recently realized that he would need the testimony of a toxicologist.

At a hearing held on the same day, the trial court addressed defendant's motions to add Cohle and Eisenga. Defendant's trial counsel noted that although he forgot to add Cohle by motion, the prosecution had actual notice of defendant's intention to call Cohle for more than one year. Defendant's trial counsel admitted that the prosecution did not have significant notice of defendant's intention to call Eisenga, but explained that he decided to add Eisenga to the list only after Cohle advised him that he should have a defense toxicologist to counter the testimony of the prosecution's toxicologist.

The prosecution objected to the addition of Eisenga because it violated the trial court's earlier order that witnesses had to be added by motion. And, if the trial court were to permit the addition of Eisenga, the prosecution would ask that the court order defendant to comply with MCR 6.201 by providing a summary of the proposed testimony and the underlying basis of his opinion.

After hearing the arguments, the trial court denied as untimely defendant's motion to add Eisenga; however, the court informed defendant that it would allow her to make an offer of proof and might reconsider the motion on the basis of the offer.

On March 1, 2006, the trial court excused the jury for the day in order to hear arguments about defendant's renewed motion to add Eisenga and evaluate defendant's offer of proof. (Although defendant served an offer of proof on the prosecution shortly thereafter, a copy was apparently not placed in the record until much later.) After the jury left the court, defendant's trial counsel explained that he had orally told the prosecu-

tion about Eisenga approximately three weeks earlier. Defendant's counsel stated that, at that time, the prosecution did not indicate that it had had prior contact with Eisenga. Defendant's counsel stated that Eisenga had subsequently informed him that the prosecution had contacted Eisenga six years earlier about the case and that he would not testify without a release from the prosecution.

Defendant's trial counsel explained that the prosecution indicated that it would object to Eisenga's testimony on the basis of this prior contact. So defendant's trial counsel requested permission to add a different toxicologist. Defendant's trial counsel argued that the prosecution would suffer no prejudice because it already had its own toxicologist who was aware of the areas about which defendant's toxicologist would testify. Further, he argued that, on the basis of Cohle's recommendation, he believed the toxicologist's testimony would be helpful to the jury and, "if it were excluded, it would—it would substantially impact on [] the defense."

The prosecution responded by noting that defendant's trial counsel's offer of proof indicated that the toxicologist would discuss postmortem redistribution, an issue that arose at the 2000 preliminary examination. Thus, the prosecution argued, the issue was not new, and defendant's trial counsel could not now argue that he had only just learned of its importance. The prosecution noted that it takes extensive preparation to prepare for expert testimony, and that, under the circumstances, it was not even clear whom defendant would call. Accordingly, he concluded, "It's too late in the game for him to start bringing in new people, especially experts."

The trial court stated that defendant's trial counsel appeared to know about the issue of postmortem redis-

tribution years earlier and that it would now be unfair to add another expert. The court explained:

> To say that there's no prejudice, when we don't have any idea who the witness would be or what they would say, is just total speculation; and that's what prejudice would really be here, because there'd be no way to prepare for it prior to their coming in now and—and perhaps saying something that would need verification or some other method of preparation.

On March 7, 2006, defendant's trial counsel renewed his request to add a toxicologist to his witness list. Defendant's trial counsel argued that there would be no prejudice to the prosecution and even offered to make the witness available to the prosecution before the witness testified. But the trial court continued its ruling that the addition was too late.

### 3. DR. COHLE'S TOXICOLOGY TESTIMONY

On March 27, 2006, the trial court held a hearing, which included Dr. Cohle by telephone, to address issues involving Cohle's proposed testimony. At the hearing, Cohle stated that he disagreed with the conclusion that Monique died of an overdose of Imipramine. He explained that he did not believe that the conclusion properly took into consideration the phenomenon of postmortem redistribution. He stated that he consulted a standard text used by pathologists and found that postmortem redistribution could increase the level of Imipramine in the blood by up to a factor of three. Thus, he explained, the blood result taken at face value constituted an overestimation. Further, he stated that, even assuming that this level were accurate, the standard text indicated that the lethal level of Imipramine is actually higher than the amount found in Monique's system. Hence, the amount of Imipramine in

Monique's system was likely not lethal. Given this, Cohle stated that Monique's heart defect was more likely the cause of death.

Cohle also noted that there was no literature discussing levels of Imipramine that would be lethal in children. Cohle further testified that even if the level of Imipramine in Monique's blood were accurately stated at 1950 nanograms per milliliter, it would only take 30 to 40 pills to reach that level. This was in contrast to the testimony of the prosecution's toxicologist, who testified that it would take between 80 and 120 pills to reach that level, and the prosecution's forensic pathologist, who testified that it would take between 90 and 100 pills to reach that level. Cohle explained that he came to this conclusion by applying a simple formula involving Monique's weight, the dosage, and the volume of distribution for Imipramine, which he obtained from a standard source.

Cohle also stated that the ratio of Imipramine to Desipramine, an antidepressant drug, in Monique's system could also indicate that Monique was taking a chronic low dose of Imipramine; this statement directly contradicted the testimony of the prosecution's pathologist, who testified that the ratio of Imipramine and Desipramine indicated that the bulk of the drug was introduced shortly before Monique's death.

Cohle testified that although he obtained the case materials sometime in 2005 and reported his conclusions to defendant's trial counsel sometime after July 2005, he thought that he reported his conclusions in either late 2005 or early 2006. Cohle stated that he did not place his findings in writing until just one week before the hearing. He explained that that was when he was asked to do so. Cohle stated that after he reached his own conclusions, he consulted with Eisenga about

his findings to confirm that he "was on the right track." He noted that Eisenga agreed with him.

Although Cohle indicated that he came to his findings employing his own expertise, because Cohle relied on outside references to determine the pharmacological characteristics of Imipramine, the trial court severely limited Cohle's ability to offer opinions concerning the Imipramine found in Monique's blood. The court explained that, under MRE 703, "any underlying data that he's basing his opinion on, any facts, have to be in evidence." The court further ruled that the learned treatise Cohle relied on to familiarize himself with the pharmacological characteristics of Imipramine would not be admissible under any exception to the hearsay rule. For this reason, the court prevented Cohle from testifying that the Imipramine level might not have caused Monique's death, from opining that the number of pills that would be necessary to reach the level found in Monique's blood was substantially less than the 90 to 120 pills posited by the prosecution's toxicologist, and from discussing how postmortem redistribution might have affected the level of Imipramine found in the blood sample taken from Monique. At that time, the trial court clearly recognized that defendant's case was prejudiced by having no testimony from its own expert on toxicology. The court even stated that it may very well have allowed defendant to present the testimony of a toxicologist, if "it would have known the reason for wanting a toxicologist at that time."

Defendant's trial counsel again asked the trial court to permit him to call a toxicologist. After a brief discussion off the record, the trial court stated that it had asked the prosecution if it would waive its objection to Cohle's testimony under MRE 703. But the prosecution had refused. Therefore, the trial court determined

that Cohle would not be permitted to testify about those areas. In addition, the trial court again denied both defendant's request to call a toxicologist and her requests for either a mistrial or a continuance to file for leave to appeal in this Court.

### B. DEFENDANT'S LATE ENDORSEMENT OF A TOXICOLOGIST

#### 1. STANDARD OF REVIEW

A trial court's decision to permit or deny the late endorsement of a witness is reviewed for an abuse of discretion. *People v Callon*, 256 Mich App 312, 325-326; 662 NW2d 501 (2003). A trial court abuses its discretion when its decision falls outside the range of reasonable and principled outcomes. *Young, supra* at 448.

#### 2. ANALYSIS

A defendant has a constitutionally guaranteed right to present a defense, which includes the right to call witnesses. US Const, Am VI; Const 1963, art 1, §20; see also *People v Hayes*, 421 Mich 271, 278-279; 364 NW2d 635 (1984) (noting that an accused has the right to present his or her own witnesses to establish a defense). But this right is not absolute: the "accused must still comply with 'established rules of procedure and evidence designed to assure both fairness and reliability in the ascertainment of guilt and innocence.' " *Id.* at 279, quoting *Chambers v Mississippi*, 410 US 284, 302; 93 S Ct 1038; 35 L Ed 2d 297 (1973). Nevertheless, the sanction of preclusion is extreme and should be limited to only the most egregious cases. *People v Merritt*, 396 Mich 67, 82; 238 NW2d 31 (1976) (discussing whether the trial court erred when it precluded the defendant from presenting an alibi defense after the defendant

failed to comply with the alibi notice requirements). This is not such a case.

Defendant's trial counsel formally asked the trial court to permit him to add a toxicologist on three separate occasions: at the hearing held on February 21, 2006, during trial on March 1, 2006, and at trial on March 7, 2006. Defendant's trial counsel also raised the trial court's refusal to permit defendant to call an expert toxicologist during the discussions before Cohle testified. But in each case the trial court denied the motion.

In the request of February 21, defendant's trial counsel indicated that he wanted to call a toxicologist because defendant's new pathologist opined that it would be helpful. Admittedly, defendant did not make an offer of proof or otherwise state why the defense needed a toxicologist. But the court had a long history with this case and was well aware of the fact that the prosecution's case rested primarily on the level of Imipramine found in Monique's blood, the number of pills that it would take to reach that level, and the inferences that could be drawn from that evidence. Thus the trial court was aware of the importance of toxicology evidence. Furthermore, although the prosecution objected to the addition of Eisenga as a violation of the trial court's earlier order, it did not indicate that it would suffer any prejudice if the trial court granted the request. Indeed, the prosecution stated that if the trial court were to permit the addition of Eisenga, it merely wanted defendant to provide a written summary of Eisenga's opinion and the underlying basis for it, to which defendant's trial counsel readily agreed. Despite this, the trial court denied defendant's motion to add Eisenga on the basis of timeliness alone.

The decision to initially deny defendant's request to call a toxicologist was not within the range of reasonable and principled outcomes. There was no indication at the February 21 hearing that defendant had engaged in abusive conduct or that the prosecution would be prejudiced by the defense's addition of a toxicologist. Although defendant's request came one day before trial, the parties indicated that it would take a full month to put on the case. Furthermore, defendant's trial counsel had offered to submit a written synopsis of the expert's opinion and the basis for that opinion to the prosecution. And the prosecution already had an expert toxicologist prepared to testify about the Imipramine found in Monique's blood. Therefore, the prosecution had both the means and the time to adequately prepare for defendant's toxicologist. "Clearly, it would be improper to exclude the defense where neither serious abuse of the right on the part of defendant nor prejudice to the people's case [has] been demonstrated." *Merritt, supra* at 82. Hence, the trial court abused its discretion when it denied defendant's request to add Eisenga on February 21.

The trial court again abused its discretion when it denied defendant's renewed motion to add a toxicologist on March 1. Defendant's trial counsel renewed his motion to add a toxicologist in reliance on the trial court's earlier indication that it might reconsider the issue after an offer of proof. By this time, defendant's trial counsel submitted an offer of proof to the prosecution and indicated that the defense would be adversely affected if prevented from calling a toxicologist. Defendant's trial counsel also reiterated that there was ample time for the prosecution to prepare and stated that he would make the witness available to the prosecution before testifying. Nevertheless, the trial court again denied the motion.

The trial court noted that defendant's trial counsel was apparently aware of the issues about which the toxicologist would testify from at least the time of the preliminary examination and concluded that it would now be unfair to add another expert. The court explained that the prosecution would be prejudiced because defendant had not even identified who the witness would be and, therefore, the prosecution would be unable to prepare. Although these appear to be valid considerations, on careful examination of the record, it is clear that defendant's trial counsel acted reasonably and that the trial court could have added defendant's original toxicologist or another toxicologist without prejudicing the prosecution.

At the preliminary examination, defendant's trial counsel did in fact address the possibility that the level of Imipramine found in Monique's blood could have been affected by the phenomenon of postmortem redistribution. However, defendant's trial counsel did not elicit this testimony to prove that the level of Imipramine found in Monique was not lethal. Rather, it was defendant's sole theory at that time that Monique deliberately or accidentally ingested the pills on her own. Indeed, defendant's own pathologist at the time testified that he was certain that Monique died of an Imipramine overdose in light of the level of Imipramine in Monique's system and the fact that Monique's symptoms were typical of Imipramine poisoning. At the preliminary examination, defendant's pathologist merely offered testimony to rebut the conclusion of a witness for the prosecution, Dr. Kanu Virani, the forensic pathologist who performed the autopsy on Monique, that the absence of pill fragments in Monique's stomach suggested that the pills had been dissolved before ingestion. For this reason, defendant's pathologist concluded that the cause of death could not be definitively

ruled a homicide. Taken in context, it appears that defendant's trial counsel's cross-examination of the prosecution's experts at the preliminary examination on the issue of postmortem redistribution was limited to attempting to show that the experts were not being impartial or thorough.

It was not until more than five years after the preliminary examination that Cohle offered his opinion that Monique might not have died from Imipramine poisoning at all and suggested that defendant might want to call a toxicologist to offer an opinion about the level of Imipramine found in Monique's blood. Given the convoluted history of this case and that defendant's prior pathologist opined that he was *certain* that Monique died of an Imipramine overdose, defendant's trial counsel cannot be faulted for failing to realize the need for a toxicologist earlier than late 2005 or early 2006. Further, defendant's trial counsel would then have had to investigate Cohle's opinion and secure a toxicologist. Understood in light of the totality of the circumstances, the lateness of defendant's trial counsel's initial motion to add a toxicologist does not appear to have been motivated by gamesmanship or an abuse of the right to call witnesses. See *Merritt, supra* at 82.

The record also does not support the trial court's conclusion that the prosecution would be prejudiced by the late endorsement of the toxicologist. Defendant's trial counsel originally identified Eisenga as the proposed toxicologist. At the February 21 hearing, the prosecution only argued that defendant's motion to add Eisenga should be denied because it was untimely. The prosecution did not state that it had any other objection to Eisenga. However, at the March 1 hearing, defendant's trial counsel revealed that the prosecution had contacted Eisenga about the case in 2000. Defendant's

trial counsel indicated that Eisenga would not testify without first obtaining a signed release from the prosecution, which the prosecution would not give. For this reason, defendant's trial counsel was forced to ask for permission to add an unidentified toxicologist.

In considering the renewed motion, the trial court clearly gave weight to the fact that defendant did not have a toxicologist ready to testify when it concluded that the prosecution would be prejudiced. But the trial court apparently did not consider the fact that the prosecution contributed to this problem. Further, the trial court did not explore the propriety of removing Eisenga as a potential witness. At the hearing, defendant's trial counsel indicated that Eisenga himself brought to defendant's trial counsel's attention the issue of the prior contact and that Eisenga was not even sure of the contact. Defendant's trial counsel explained:

> He indicated to me, he said, "Hey, you know, I'm—I'm not sure, but, you know, the—you don't get calls on cases involving the death of—of little kids very often," and he said, "I—I have some memory of being contacted by someone, I think it may have been Bay County, in reference a—a death of a small child case," and he said, "It—it may have been this case."
>
> And I said, "Well, did you do any reports for them?" And he said, "No"; I said, "Well," you know, "what—what was your involvement?" He said, "I just talked with 'em a little bit and that was the end of it, and I never heard from them again."

After explaining that his proposed toxicologist would not testify without a release, defendant's trial counsel also indicated that the prosecution informed him that it would also object to Eisenga's colleague's testifying on defendant's behalf.

In response, the prosecution noted that someone from the prosecutor's office did recall speaking to Eisenga at the very beginning of the case. But the prosecution did not offer a reason for refusing to provide Eisenga with a release and did not explain why it would object to Eisenga's colleague's testifying for the defense. Given the extremely limited nature of the contact and the fact that the contact was approximately six years earlier, the prosecution's failure to provide a release appears manifestly unreasonable. Yet the trial court failed to investigate the matter further. In addition, it is clear from the record that Eisenga would have testified had he been given some assurance that he would incur no liability. Thus, had the court elected, it could have ordered Eisenga to testify. Instead, the trial court impliedly sanctioned the prosecution's unreasonable refusal and held it against defendant in considering the motion.

In addition, defendant's trial counsel indicated that he orally informed the prosecution about Eisenga approximately three weeks before the March 1 hearing, which would have been approximately two weeks before defendant first moved to add Eisenga as a witness. Had the prosecution raised its objections then or at the February 21 hearing, defendant likely would have had sufficient time to find a new toxicologist. Notwithstanding the prosecution's unreasonable refusal to release Eisenga and the fact that several days were lost by the trial court's summary rejection of defendant's first request, there was still adequate time to find and prepare for a new toxicologist. The prosecution's first witnesses did not begin to testify until February 28, and the prosecution had already stated its belief that its proofs would take two weeks. Further, the prosecution already had a toxicologist who was going to testify on the same matters that defendant's trial counsel identi-

fied in his offer of proof, and defendant's trial counsel had offered to make the new toxicologist available to the prosecution. Hence, the prosecution would not have been prejudiced by the addition of the toxicologist. In contrast, given the nature of the toxicology evidence against defendant, the trial court should have realized that the importance of the toxicologist to the defense substantially outweighed any prejudice that the prosecution might suffer in preparing for the late endorsement.

For these reasons, we conclude that the trial court's decision to again deny defendant's request to add a toxicologist on March 1 fell outside the range of reasonable and principled outcomes. *Young, supra* at 448. Rather than resort to this extreme sanction, the trial court should have fashioned some remedy that would have assured defendant a fair opportunity to present her defense while limiting any prejudice to the prosecution. See *Merritt, supra* at 79-83 (examining whether, under the totality of the circumstances, the trial court abused its discretion when it resorted to the sanction of preclusion rather than granting a continuance).

### 3. CONCLUSION

Under these facts, we cannot conclude that the trial court's decision to preclude defendant from calling a toxicologist fell within the range of reasonable and principled outcomes. *Young, supra* at 448. Further, this error was not harmless. See *Lukity, supra* at 495-496. By depriving defendant of a toxicologist, the trial court effectively prevented defendant from establishing that the measured level of Imipramine in Monique's blood was not sufficient to cause her death and might even be significantly overstated. In addition, defendant was not able to contradict the prosecution's assertion that the

number of pills needed to reach the measured level of Imipramine was 90 to 120. Because the sheer number of pills suggests deliberate poisoning by a third party, defendant's inability to challenge this testimony severely hampered her theory that Monique might have deliberately or accidentally ingested the pills. Indeed, even the trial court eventually recognized the importance of the toxicologist's testimony after it barred Cohle from offering any testimony suggesting that the level of Imipramine found in Monique's blood was inaccurate or not sufficiently high to have caused her death. Consequently, this error independently warrants reversal of defendant's convictions and remand for a new trial.

### C. INEFFECTIVE ASSISTANCE OF COUNSEL

In the alternative, defendant argues that her trial counsel was ineffective for failing to timely request a toxicologist. To establish ineffective assistance of counsel, the defendant must first show: (1) that counsel's performance fell below an objective standard of reasonableness under the prevailing professional norms, and (2) that there is a reasonable probability that, but for counsel's error, the result of the proceedings would have been different. *Bell v Cone*, 535 US 685, 695; 122 S Ct 1843; 152 L Ed 2d 914 (2002); *People v Toma*, 462 Mich 281, 302-303; 613 NW2d 694 (2000). In order to meet the second requirement, a defendant must show that counsel's error was so serious that the defendant was deprived of a fair trial, i.e., the result was unreliable. *People v LeBlanc*, 465 Mich 575, 578; 640 NW2d 246 (2002).

As noted above, defendant's trial counsel reacted in a reasonably timely fashion after obtaining information that suggested that he would need a toxicologist. There-

fore, defendant's trial counsel was not ineffective for failing to earlier request the endorsement of Eisenga.

### D. PRECLUSION OF COHLE'S TESTIMONY UNDER MRE 703

Although defendant has not appealed the trial court's decision to prevent Cohle from offering certain testimony involving the Imipramine found in Monique's blood, because we are convinced that this decision was plain error, see *People v Carines*, 460 Mich 750, 763-764; 597 NW2d 130 (1999),[5] which is likely to be repeated on remand, we elect to address this issue sua sponte. See MCR 7.216(A)(7); *People v Noel*, 88 Mich App 752, 754; 279 NW2d 305 (1979) ("Generally we do not address issues not raised by the parties on appeal. However, our function is to dispense justice, and we are given the limited power to raise questions on our own."), citing *Dearborn v Bacila*, 353 Mich 99, 118; 90 NW2d 863 (1958) (noting that there "is no hard and fast rule that appellate courts, sitting either in law or equity, cannot and, hence, do not raise and decide important questions *sua sponte*").

As already noted, the trial court severely curtailed Cohle's ability to offer an opinion involving the accuracy of the level of Imipramine in Monique's blood, the accuracy of the calculation of the number of pills that it would take to reach that level, and whether the Imipramine in Monique's blood was sufficient to cause her death. The trial court did not conclude that Cohle was not qualified to offer expert testimony on these issues. See MRE 702. Rather, it concluded that because Cohle stated that he could only offer an opinion on these topics after reviewing the published pharmacological

[5] Indeed, had the trial court permitted Cohle to testify on these matters, the trial court's denial of defendant's motion to add a toxicologist may very well have been harmless.

data for Imipramine, the data would have to be admitted into evidence and they could not be admitted because they would be hearsay. Therefore, the trial court concluded that Cohle could not offer any opinions that utilized data about Imipramine obtained from an outside source.

By special record, Cohle stated that through experience he was generally familiar with postmortem redistribution, but that the ratio of heart blood to peripheral blood will vary on the basis of the specific characteristics of the drug at issue. Because he did not have the characteristics of Imipramine memorized, Cohle indicated that he had to look up the ratio in a widely used medical text by Dr. Randall C. Baselt. He also indicated that he would have to use the Baselt book to determine the lethal level of Imipramine and its half-life in order to calculate the time between ingestion of the Imipramine and Monique's death. Finally, he stated that he was generally familiar with the formula for calculating the number of pills that it would take to reach a certain concentration of a particular drug—given the dosage and the weight of an individual—but admitted that he would also need to know the volume of distribution for Imipramine before he could calculate the figure. Because he did not know the volume of distribution for Imipramine, he consulted a text that is part of the Micromedics Healthcare Series that is used by his hospital's poison control center.

The prosecution's toxicologist and pathologist both relied on data for Imipramine from outside sources in rendering their opinions. But the trial court nevertheless precluded Cohle from relying on outside data except to the extent that the data were admitted during the testimony of the prosecution's witnesses. The trial court barred Cohle from offering opinions on these

topics because his opinion had to be based on facts or data in evidence under MRE 703, and the treatises could not be placed into evidence because they were hearsay.

MRE 703 provides:

> The facts or data in the particular case upon which an expert bases an opinion or inference shall be in evidence. This rule does not restrict the discretion of the court to receive expert opinion testimony subject to the condition that the factual bases of the opinion be admitted in evidence thereafter.

Hence, under this rule, an expert may not offer an opinion that is based on "facts or data in the particular case" unless the facts or data are in evidence or will be in evidence.

But the reference to facts or data "in the *particular case*" limits the type of evidence that must be admitted into evidence to facts or data that are *particular* to that case. That is, the fact or datum must be specific to the case. Here, some facts that are particular to the case are: Monique's weight, that the blood sample was taken from the heart, that Imipramine was found in the blood, that the Imipramine level was 1950 nanograms per milliliter, and the dosage of the pills prescribed to Monique. But the pharmacological characteristics of Imipramine were not "facts or data in the particular case . . . ." Rather, the half-life of Imipramine, the ratio of postmortem redistribution, the volume of distribution, and the level of Imipramine that would be lethal in a human are all constants in every case involving Imipramine. Therefore, it was not necessary to have the data in evidence before Cohle could utilize them in rendering an opinion.

Even if the pharmacological characteristics of Imipramine had to be placed in evidence before Cohle could

render an opinion based in part on those characteristics, the treatises Cohle relied on were clearly admissible under MRE 803(24) as an exception to the prohibition against hearsay. Under MRE 803(24), a statement not specifically covered by any other hearsay exception, "but having equivalent circumstantial guarantees of trustworthiness," may be admitted if the court determines that "(A) the statement is offered as evidence of a material fact, (B) the statement is more probative on the point for which it is offered than any other evidence that the proponent can procure through reasonable efforts, and (C) the general purpose of these rules and the interests of justice will best be served by admission of the statement into evidence."

Given the incredible number of drugs that have been and continue to be marketed to the public, it is highly unlikely that a physician will be familiar with the specific pharmacological characteristics of any particular drug. Accordingly, in order to treat patients and form opinions, physicians and other experts must routinely consult references that list the key pharmacological characteristics for drugs. In order to be useful to the experts who utilize these references, the texts must be objective, thorough, accurate, and current. Therefore, those references that have obtained widely recognized acceptance by the community of experts who use them will meet the trustworthy requirements of MRE 803(24).

As already noted, the prosecution's pathologist and toxicologist both used and recognized outside sources on the pharmacological characteristics of Imipramine. Likewise, Cohle stated that the Baselt book was a widely recognized and commonly used reference for determining the pharmacological characteristics of drugs. In addition, Cohle indicated that he relied on a

text from the Micromedics Healthcare Series, which is used by his hospital's poison control center, to determine the volume of distribution for Imipramine. Hence, these references clearly met the requirements of MRE 803(24). Consequently, the trial court plainly erred when it determined that the data from these references were hearsay that did not fall within any exception.

### V. PATHOLOGIST'S QUALIFICATION TO RENDER AN OPINION ON SUICIDE BY CHILDREN

Defendant next argues that the prosecution's medical examiner was not qualified to offer an opinion that children who are seven years old do not have the mental maturity to commit suicide. Defendant further argues that there were no facts or data in evidence to support the medical examiner's opinion. Consequently, defendant concludes, the trial court should have excluded this testimony. We disagree.

### A. RELEVANT TESTIMONY

At trial, the prosecution called Dr. Virani, who was the forensic pathologist that performed the autopsy on Monique. Virani testified that Monique had an abnormal heart, but that the abnormality had nothing to do with Monique's death. Virani further stated that he found only mild pulmonary and brain edema and that, from these findings, he could not determine the cause of death. However, he stated that he took a blood sample and that later testing showed the presence of Imipramine, which he determined to be at a toxic level. From this he determined that Monique died from acute Imipramine poisoning.

On the basis of the amounts of Imipramine found in the blood and the amount of the metabolic byproduct of Imipramine, Virani determined that Monique was not

using Imipramine for an extended period. Rather, the Imipramine was introduced into her system shortly before her death. He also opined that it would take 90 to 100 pills to reach the level of Imipramine found in Monique's blood. Finally, he noted that he did not find any pill residue in Monique's stomach and, from this, he concluded that the Imipramine was probably liquefied before it entered Monique's body.

Virani concluded that the manner of death was homicide. He came to this conclusion on the basis of information that Monique would not have accidentally taken the medication and that she was too young to have committed suicide. When asked about whether seven-year-old children commit suicide, Virani stated that he was not aware of any forensic pathologist classifying the death of a child of that age as a suicide. He stated that children of that age do not have the mental maturity to commit suicide.

Defendant's trial counsel objected to Virani's testimony concerning whether children of Monique's age are capable of committing suicide on the ground that Virani lacked sufficient expertise to offer the opinion. The trial court overruled the objection and determined that Virani was sufficiently qualified to testify about whether children of Monique's age commit suicide.

## B. ANALYSIS

MRE 702 governs the qualification of expert witnesses for the purpose of offering testimony at trial. Under MRE 702, an expert may not testify unless the trial court first determines that "scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue" and the expert witness is "qualified as an expert by knowledge, skill, experience, training, or education . . . ." Based on the language of MRE 702 and MRE

104(a), which requires trial courts to determine preliminary questions concerning the qualification of a person to be a witness, trial courts have an obligation to exercise their discretion as a gatekeeper and ensure that any expert testimony admitted at trial is reliable. *Gilbert v DaimlerChrysler Corp*, 470 Mich 749, 780; 685 NW2d 391 (2004).

> This gatekeeper role applies to *all stages* of expert analysis. MRE 702 mandates a searching inquiry, not just of the data underlying expert testimony, but also of the manner in which the expert interprets and extrapolates from those data. Thus, it is insufficient for the proponent of expert opinion merely to show that the opinion rests on data viewed as legitimate in the context of a particular area of expertise (such as medicine). The proponent must also show that any opinion based on those data expresses conclusions reached through reliable principles and methodology. [*Id.* at 782 (emphasis in original).]

In the present case, Virani testified that he is a medical doctor and is board-certified in forensic pathology, which involves the investigation of suspicious and violent deaths. He also stated that he has served as a medical examiner for several counties since 1988 and performed over 13,000 autopsies. Hence, Virani was clearly qualified to testify as a medical doctor who specializes in forensic pathology. Nevertheless, defendant argues that Virani's qualifications are insufficient to offer an opinion about whether seven-year-old children are sufficiently mature to commit suicide.

Although Virani was not an expert on suicide, this alone did not preclude him from offering an opinion about whether Monique committed suicide. Rather, under some circumstances an expert's qualifications pertain to weight rather than admissibility. See *id.* at 788-789. Nevertheless, if the subject of the proffered testimony is far beyond the scope of the witness's expertise, the testimony will be inadmissible. *Id.* at 789.

It is noteworthy that medical examiners, such as Virani, are statutorily required to investigate the cause and manner of the death of an individual under certain circumstances. See MCL 52.202. As a result, medical examiners must routinely investigate and determine whether the manner of death for a particular person was suicide. In this regard, Virani testified that he was unaware of any cases where a forensic pathologist classified the death of a child of Monique's age as suicide. And he stated that he personally has never experienced a child of this age committing suicide or accidentally ingesting 90 to 100 pills.

In addition to his experience in the field of forensic pathology, Virani indicated that his opinion was also based on his knowledge of the human brain. Although medical doctors are not necessarily experts on the development of the human brain, medical training clearly includes a basic understanding of brain development. Thus, Virani was minimally qualified by both experience and training for purposes of MRE 702 to offer an opinion about whether children of Monique's age commit suicide. Consequently, any limitations in his experience and training were properly a matter of weight rather than admissibility. *Gilbert, supra* at 788-789, 789 n 63. Finally, Virani was not required by either MRE 702 or MRE 703 to offer data in support of his opinion that children of Monique's age do not normally commit suicide. Rather, his opinion need only be based on the actual facts admitted into evidence and his general training and experience.

### C. CONCLUSION

The trial court did not abuse its discretion when it determined that Virani was qualified to offer an opinion on whether children of Monique's age commit suicide.

VI. EVIDENCE OF OTHER ACTS

Finally, defendant argues that the trial court improperly permitted the prosecution to solicit testimony concerning other acts involving defendant that were barred by MRE 404(b). Defendant argues that this evidence was not relevant to the stated purposes and the prosecution actually proffered the testimony to show defendant's bad character and suggest that she acted in conformity with that character.

We agree that the trial court abused its discretion when it permitted the prosecution to elicit testimony about defendant's alleged prior physical abuse of her children to prove malice, intent, and absence of mistake or accident. Likewise, to the extent that the trial court permitted the prosecution to admit the evidence of prior abuse to show that defendant abused her children when under stress, the trial court abused its discretion. However, evidence that protective services personnel had investigated allegations of abuse, which defendant claimed Monique herself falsely reported, was admissible to show that defendant had a motive to kill or hurt her. Nevertheless, because the danger of unfair prejudice substantially outweighed the probative value of the evidence to prove motive, the trial court abused its discretion when it permitted the prosecution to elicit detailed testimony concerning the specific allegations of abuse.

The trial court properly concluded that evidence that defendant was aware that Monique may have been sexually abused by others in her household and knew that permitting such abuse could lead to the removal of her children was admissible to establish motive. Likewise, the trial court properly permitted the prosecution to elicit testimony that defendant's children had been involved in prior accidental overdoses.

## A. PROCEDURAL HISTORY AND TRIAL COURT RULING

In July 2004, the prosecution gave notice to defendant that it intended to submit evidence of certain other acts at trial. Specifically, the prosecution stated that it intended to present evidence of defendant's long involvement with protective services personnel, including their investigation of allegations of physical abuse. The evidence of physical abuse would include testimony, in relevant part, that bruises were found on defendant's daughter Jessica in 1987, that defendant admitted slapping and kicking Jessica in 1988, that Jessica reported being hit in 1990, that defendant's son Joshua reported that his mother threw a cereal bowl at him and cut his head and kicked Monique in 1996, that Jessica had made allegations that defendant used a rope to tether Monique for running off in 1999, that defendant hit Monique with a fly swatter in 1999, and that defendant placed Monique in counseling to get her to stop making false allegations and reports to protective services personnel. The prosecution submitted that this abuse was relevant to show that defendant had the requisite malice, that her actions were not accidental, and to rebut defendant's claim that Monique took the pills deliberately or accidentally. The prosecution also indicated that it intended to present evidence of defendant's statements concerning the allegations to show defendant's state of mind concerning the allegations Monique made.

The prosecution also gave notice that it intended to submit evidence that defendant's children had experienced prior drug overdoses. The prosecution intended to show evidence that both Monique, at age four, and Joshua, at age six, were treated for a drug overdose in 1996 and that defendant's daughter Roxanne Davis, who was less than two years old at the time, was taken

to the emergency room in 1983 for an overdose of Benadryl. The prosecution stated that it intended to elicit evidence of these overdoses to show that defendant deliberately misled detectives when she stated that the only prior overdose had been by her son Joshua at age 2¹/₂. The prosecution also stated that the evidence was admissible to show that defendant had knowledge of the potential harm of permitting Monique to have access to the pills.

Finally, the prosecution gave notice that it intended to elicit evidence that defendant knew of prior allegations of sexual abuse involving Monique and was aware that the prosecutor had scheduled a meeting for the day after Monique's death to investigate recent allegations of sexual abuse—including a claim that Joshua had perpetrated the abuse. The prosecution stated that evidence of the recent and prior allegations of sexual abuse and defendant's involvement with protective services personnel during the investigation of those allegations would prove that defendant was aware that she could lose her children as a result of permitting the abuse to occur in her household. The prosecution argued that this evidence was admissible to show motive and to impeach statements by defendant that she was unaware of any sexual impropriety between Monique and Joshua.

Defendant objected to the proposed admission of this evidence. The trial court held a hearing on the issue in October 2004.

At the hearing, the prosecution reiterated the evidence of incidents of physical abuse that it intended to admit. The prosecution stated that the incident with the cereal bowl demonstrated that defendant could not tolerate her children during stressful times and that this resulted in "inappropriate and abusive" acts to-

ward Joshua. The prosecution again stated that the evidence was admissible to show malice and absence of mistake or accident, but also indicated that the long history of protective services involvement would help explain why defendant was so "intolerant of this child making up accusations . . . ." Further, the prosecution argued that the evidence demonstrated that defendant lacked the "ability to cope with the everyday demands of a behaviorally-difficult child." Hence, it was evidence of defendant's motive and intent to stop Monique from making allegations.

The prosecution also stated that it intended to submit evidence of the prior overdoses to prove that defendant willfully misled the police about the fact that her children had had prior overdoses. The prosecution also argued that the evidence of the overdoses demonstrates that defendant knew of the danger of an overdose and ignored the risk when she allegedly disposed of the medicine. Finally, the prosecution again argued that the allegations of prior sexual abuse were relevant to show that defendant knew that she could lose her children if Monique implicated her brother in the most recent claim of sexual abuse. At the close of the hearing, the trial court indicated that it would enter an opinion and order with regard to such evidence at a later time.

The trial court entered a preliminary order in January 2005. The trial court entered a final opinion and order in April 2005. In the opinion, the court noted that the prosecution had indicated that it intended to use the other acts evidence to prove motive, malice, intent, and absence of mistake or accident, which were all proper purposes under MRE 404(b). The court then analyzed the relevance of the various incidents.

The court determined that the incident in 1987, when bruises were found on Jessica, and defendant's

admission in 1988 that she slapped and kicked Jessica were relevant for the identified purposes: the evidence tended to show that defendant "used abusive tactics to control her children when they caused her stress in the past, and she intended to do so when she allegedly gave Monique the overdose of Imipramine." However, the trial court ruled that the 1990 incident was not relevant because it was determined that defendant's husband was responsible for Jessica's injury, and there was no evidence that defendant participated. The trial court determined that the incident in 1996 with the cereal bowl was relevant to show how defendant reacted to stress and to establish motive, malice, intent, and absence of mistake or accident. The trial court also determined that the cereal bowl incident was relevant to show both defendant's partial admission and her illogical denial of how the injury occurred. The trial court concluded that the 1999 tethering incident was relevant for the same purposes and because Monique had been punished for wandering away on the day of her death. Finally, although the trial court concluded that the 1999 fly swatter incident was unsubstantiated and prohibited its use in the prosecution's case-in-chief, it allowed the prosecution to present evidence that defendant placed Monique in counseling to get her to stop making false allegations because that showed motive, malice, intent, and absence of mistake or accident.

The trial court then determined that the incidents were highly relevant and not unfairly prejudicial. Therefore, it concluded that the prosecution would be allowed to present this evidence at trial.

The trial court next addressed the prior drug overdoses. The trial court again indicated that the prosecutor successfully identified proper purposes for the evi-

dence under MRE 404(b) and also concluded that the evidence of the prior drug overdoses was relevant to showing that defendant knew about the potential for harm with an overdose and tried to "direct attention away from the actual cause of death." Indeed, the trial court indicated that defendant's failure to tell the police of these earlier overdoses amounted to a false statement that could be used as evidence of guilt. Lastly, the court determined that because the prior incidents did not involve accusations that defendant intentionally gave the children the overdoses, the incidents did not involve prejudice that substantially outweighed the probative value of the evidence. Therefore, it concluded that the prosecution could present the evidence.

Finally, the trial court determined that the evidence of prior allegations of sexual abuse against Monique was relevant to show that defendant had a motive to kill Monique. Specifically, the court concluded that the evidence was admissible to show that defendant understood the investigation process and was aware that her children could be removed from her home as a result of the most recent allegations. Additionally, the trial court determined that the probative value of this evidence was not substantially outweighed by unfair prejudice.

At trial, the prosecution elicited testimony about each of the other acts permitted by the trial court. During closing arguments, the prosecution argued that defendant was motivated to kill Monique to keep Monique from revealing that Joshua sexually abused her, but did not otherwise raise any of the other acts evidence until rebuttal arguments. During rebuttal arguments, the prosecution noted that defendant did not mention the earlier overdoses when asked by the police and implied that defendant lied. The prosecution also used defendant's tape-recorded statements accus-

ing Monique of lying to protective services personnel and complaining that the protective services workers were constantly "on her case" to show that defendant had a motive to kill Monique.

### B. ANALYSIS

MRE 404(b)(1) provides:

> Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, scheme, plan, or system in doing an act, knowledge, identity, or absence of mistake or accident when the same is material, whether such other crimes, wrongs, or acts are contemporaneous with, or prior or subsequent to the conduct at issue in the case.

In *People v VanderVliet*, 444 Mich 52; 508 NW2d 114 (1993), our Supreme Court adopted the approach to other acts evidence enunciated by the United States Supreme Court in *Huddleston v United States*, 485 US 681, 691-692; 108 S Ct 1496; 99 L Ed 2d 771 (1988). See *Sabin, supra* at 55.

> First, the prosecutor must offer the other acts evidence under something other than a character to conduct or propensity theory. MRE 404(b). Second, the evidence must be relevant under MRE 402, as enforced through MRE 104(b), to an issue of fact of consequence at trial. Third, under MRE 403, a " 'determination must be made whether the danger of undue prejudice [substantially] outweighs the probative value of the evidence in view of the availability of other means of proof and other facts appropriate for making decision of this kind under Rule 403.' " *VanderVliet, supra* at 75, quoting advisory committee notes to FRE 404(b). Finally, the trial court, upon request, may provide a limiting instruction under MRE 105. [*Id.* at 55-56.]

The prosecution bears the initial burden of establishing the relevance of the evidence to prove a fact other than character or propensity to commit a crime. *People v Knox*, 469 Mich 502, 509; 674 NW2d 366 (2004), citing *People v Crawford*, 458 Mich 376, 385; 582 NW2d 785 (1998). "Where the only relevance of the proposed evidence is to show the defendant's character or the defendant's propensity to commit the crime, the evidence must be excluded." *Knox, supra* at 510.

### 1. EVIDENCE OF PHYSICAL ABUSE

### a. RELEVANCE FOR A PROPER PURPOSE

The trial court permitted the prosecution to elicit testimony about several allegations that defendant had physically abused her children and the investigations into those allegations. The testimony included details about incidents where defendant's daughter Jessica was found to have bruises and where defendant purportedly admitted slapping and kicking Jessica more than 10 years before Monique's death. The prosecution also elicited testimony that defendant was investigated for throwing a cereal bowl at Joshua in 1996 and tethering Monique in 1999. The trial court permitted testimony about these incidents to prove motive, malice, intent, and absence of mistake or accident.

The testimony concerning prior allegations of abuse was not relevant to show the absence of mistake or accident for the charged crime. "The relationship of the elements of the charge, the theories of admissibility, and the defenses asserted governs what is relevant and material." *VanderVliet, supra* at 75. In order to be material, the fact must be within the range of litigated matters in controversy. *Sabin, supra* at 57, 69. In the present case, defendant did not argue that she acciden-

tally gave Imipramine to Monique or that she mistakenly gave a greater dosage of Imipramine than she intended. Rather, defendant argued that she did not give Monique any Imipramine on the day of Monique's death. Hence, mistake and accident were not at issue. For the same reason, the fact that defendant may have partially admitted that the cereal bowl incident occurred, but offered an implausible mitigating explanation for Joshua's injury, is not relevant to determining whether defendant gave her daughter an overdose of Imipramine.

In addition, although malice and intent were at issue during the trial, none of the allegations of abuse involved defendant's medicating her children or otherwise forcing them to ingest anything. Rather, each of the alleged acts involved physical contact as a response to the children's behavior. Further, none of the physical contact described in the allegations of prior physical abuse was so severe as to suggest that defendant had the same or similar intent as that required in the charged offenses. Cf. *People v Biggs*, 202 Mich App 450, 452-453; 509 NW2d 803 (1993) (noting that the defendant's act of deliberately burning her child, smothering and reviving him, and giving him an overdose of medicine were probative of malice because those incidents showed intent to kill or cause great bodily harm or wanton disregard for the natural consequences of her actions). Because the alleged acts of physical abuse were so dissimilar to the conduct for which defendant was on trial, the other acts cannot be said to be within the same general category as the charged conduct. *VanderVliet*, *supra* at 79-80 (noting that the other acts must be of the same general category as the charged offense in order to be logically relevant to show intent). Finally, two of the alleged incidents occurred more than 10 years before the charged conduct and another occurred approxi-

mately three years before the charged conduct. And the tethering incident, which was the most recent allegation of abuse, was the least relevant to show intent. Although there is no time limit applicable to the admissibility of other acts evidence, see MRE 404(b), the remoteness in time between the charged conduct and the more serious allegations of physical abuse limits the logical relevance of these other acts to show intent. For these reasons, the allegations of physical abuse were not relevant to show malice, intent, or absence of mistake or accident. See *VanderVliet, supra* at 80 n 37 (noting that absence of mistake or accident is simply a form of the exception that permits the use of other acts to prove intent).

The trial court also indicated that the allegations of physical abuse were relevant to show that defendant "used abusive tactics to control her children when they caused her stress in the past, and she intended to do so when she allegedly gave Monique the overdose of Imipramine." On the surface, it appears that the trial court may have been stating that the allegations of physical abuse were admissible to show a common scheme, plan, or system in doing an act. See MRE 404(b). However, considering the dissimilarity between the charged conduct and the allegations of physical abuse, it cannot be persuasively argued that the alleged physical abuse demonstrated a common scheme, plan, or system employed by defendant to "control her children." See *Sabin, supra* at 64 ("General similarity between the charged and uncharged acts does not, however, by itself, establish a plan, scheme, or system used to commit the acts."). Instead, given the dissimilarities, the trial court's conclusion appears to permit the prosecution to use this evidence for an improper character-to-conduct purpose—to show that defendant had a propensity to violently lash out at her children under stressful situa-

tions and that she acted in conformity with that propensity. See *Knox, supra* at 512-513.

Although the trial court erred when it determined that the prosecution could present the evidence of prior physical abuse to prove malice, intent, and absence of mistake or accident, it properly concluded that the allegations of physical abuse were relevant to prove motive. Evidence of other crimes, wrongs, or acts may be offered to prove motive. MRE 404(b)(1). "Motive" is the " '[c]ause or reason that moves the will and induces action. An inducement, or that which leads or tempts the mind to indulge a criminal act.' " *People v Hoffman*, 225 Mich App 103, 106; 570 NW2d 146 (1997), quoting Black's Law Dictionary (revised 5th ed).

At trial, the prosecution offered its theory that defendant may have killed Monique out of aggravation with Monique's reports of abuse to protective services personnel. In fact, during rebuttal arguments, the prosecution used a recording of defendant's statements to emphasize this point.

> Was the defendant worried about Monique possibly sharing information about her brother to Protective Services and the prosecutor's office during that scheduled interview on October 11th, 1999, or was the defendant worried about Monique making other allegations about her to Protective Services?
>
> (Tape recording played)
>
> "I had Protective Services on my butt and on my butt and on my butt. Monique always told lies."
>
> \* \* \*
>
> "She was coming home, and so I waited right out here, and when she got close I says, 'Get your ass over here now. I am pissed.' And so she gets over here. I says, 'Why are you taking off?' She wouldn't answer me. I says, 'Fine.' Wang,

paddled her on the butt once. I says, 'You get your damn ass on the couch and you lay down. You're takin' a nap. I'm pissed.' "

(Pause)

"I locked her in the attic, I tied her up, I hit her with the fly swatter, I hit her with the belt, I shoved her down."

(Pause)

"I had Protective Services on my butt and on my butt and on my butt. Monique always told lies."

"I hate you. One of these days I'm gonna kill you."

These statements and defendant's long history of involvement with protective services investigations are strong evidence of defendant's motive. Hence, the trial court correctly determined that the allegations of prior abuse and defendant's history of involvement with protective services personnel were relevant to prove something other than an improper character-to-conduct purpose.

### b. MRE 403

Even though the evidence concerning defendant's involvement with protective services investigations as a result of allegations of abuse by her children was relevant to prove something other than bad character, this alone does not mean that the evidence was admissible. *VanderVliet, supra* at 75. Rather, the evidence may still be inadmissible if the probative value of the evidence "is substantially outweighed by the danger of unfair prejudice . . . ." MRE 403; *VanderVliet, supra* at 74.

Because of the unique facts of this case, we conclude that the prejudicial nature of the evidence actually offered at trial substantially outweighed the value for which the evidence was properly probative.

As already noted, there was no direct physical evidence or eyewitness testimony that tended to show that defendant caused Monique to ingest Imipramine. Hence, if the jury concluded that Monique died from Imipramine poisoning, the primary question remaining would have been whether defendant caused Monique to ingest the Imipramine or whether Monique ingested it herself. Under these circumstances, the evidence that defendant harbored anger toward Monique for making allegedly false accusations of child abuse that resulted in unwanted attention from protective services workers, constituted evidence that defendant may have been motivated to kill or cause serious physical harm to Monique. However, although the testimony about the extent and specifics of defendant's involvement with protective services personnel was probative of defendant's motive, it was also powerful evidence that defendant was a poor mother who repeatedly neglected and abused her children. As a result, there was a significant possibility that the jury might inappropriately use this evidence to conclude that defendant acted in conformity with her abusive character and poisoned Monique. In addition, the prosecution could have established defendant's motive without resort to proof of the specifics of defendant's involvement with protective services investigations. See *VanderVliet, supra* at 75 (noting that the analysis under MRE 403 should take into consideration the probative value of the evidence in view of the availability of other means of proof). Furthermore, the testimony included discussions of neglect and abuse that also pertained to defendant's other children. Yet the evidence of abuse and neglect directed toward defendant's other children was—at best—only minimally probative of defendant's motive to kill or harm Monique. And the danger of unfair prejudice substan-

tially outweighed any minimal probative value that the evidence of abuse and neglect may have had. MRE 403.

Given the limited necessity of the evidence to prove motive and the high probability that the jury improperly used the testimony, we conclude that the trial court abused its discretion when it determined that the evidence of specific allegations of abuse was not substantially outweighed by the danger of unfair prejudice. Had the trial court limited the testimony to establishing generally that protective services workers had investigated allegations of abuse and neglect by defendant relating to Monique and that those investigations were initiated after Monique made statements describing inappropriate conduct, the danger of unfair prejudice would not have substantially outweighed the probative value of the evidence to show motive. However, as presented at trial, the prejudicial nature of the evidence substantially outweighed the probative value of the evidence. MRE 403.

### 2. EVIDENCE OF PRIOR DRUG OVERDOSES

At trial, the prosecution elicited testimony about two incidents of prior drug overdoses involving defendant's children. The prosecution elicited testimony from Dr. Michael Davison, who testified that in 1983 he treated defendant's daughter Jessica for an overdose of Benadryl. Davison said that defendant stated that the Benadryl was kept on a high shelf and that Jessica, who was 21 months old at the time, climbed up and consumed two-thirds of the bottle. Davison said the overdose could have been fatal.

The prosecution also elicited testimony that Monique and her brother had both been involved in an overdose in 1996. Dr. Renae Carter testified that defendant called her at Bay Medical Center and reported that Monique

and her brother had accidentally taken medication. Carter said she advised defendant to call the poison control center. Carter stated that defendant came in the next day with the children and reported that the children had climbed to the top of the refrigerator and drank from two bottles of prescription medicine.

As already noted, the trial court permitted the admission of this evidence to prove that defendant was aware of the risks of leaving medicine in places that were accessible to children and to show that defendant may have misled the police when they inquired about prior overdoses. Because the prosecution argued that, at the very least, defendant was grossly negligent in leaving the Imipramine where Monique could get to it, defendant's experience with her children's prior involvement with accidental overdoses was relevant. Likewise, the fact that defendant may have lied about her knowledge of these overdoses was relevant to show consciousness of guilt. Hence, this testimony was relevant to and offered for purposes other than to show that defendant had bad character. *Sabin*, *supra* at 55-56. In addition, although a jury might infer from the incidents that defendant was culpably involved with the overdoses, either deliberately or negligently, the danger of unfair prejudice was minimal and did not substantially outweigh the probative value of the evidence. MRE 403. Therefore, the trial court did not abuse its discretion in permitting this testimony.

### 3. EVIDENCE OF SEXUAL ABUSE

At trial, the prosecution also presented evidence that there had been allegations that Monique had been sexually abused before her death. Some of the testimony involved prior allegations of sexual abuse and the investigations that followed. Other testimony involved

a recent allegation that a young man staying at the Yost home had sexually assaulted Monique. The prosecution further presented evidence that the young man had indicated that Joshua was actually responsible for the abuse. The prosecution presented the evidence to show that defendant was aware of the procedures for investigating allegations of sexual abuse and was aware that it could result in the removal of her children. The prosecution also presented evidence that Monique died the day before she was scheduled to meet with the prosecutor. The prosecution theorized that defendant was motivated to kill or hurt Monique to prevent Monique from making allegations that could result in further disruptions to defendant's life.

The proffered evidence showed that allegations of sexual abuse had plagued the family in the past and resulted in intrusive investigations. Further, the testimony indicated that defendant had been told that she could lose her children if she permitted sexual abuse in her household. And, in the case of one prior allegation, there was testimony that defendant actually asked her husband to leave the home for one year. There was even testimony that defendant received public support for her children, which she would lose if the children were removed. Hence, the evidence was relevant for a purpose other than a character-to-conduct theory—i.e. to prove that defendant had a motive to kill or hurt Monique in order to avoid the problems associated with the investigation of new allegations.

Furthermore, although the testimony clearly implicated defendant's ability to provide a safe and proper home environment for Monique, the danger of unfair prejudice did not substantially outweigh the probative value of the evidence. MRE 403. The evidence did not involve allegations that defendant took an active role in

the abuse or that she could have prevented it and failed to do so. Further, defendant was able to present a significant amount of evidence that she responded to the prior allegations of sexual abuse in an appropriate manner and had affirmatively taken steps to report the abuse and protect Monique from harm. Likewise, defendant was able to present evidence that she cooperated during prior investigations of abuse and that, although defendant was aware of an upcoming meeting with the prosecutor, she was not aware of the exact date. Finally, the trial court did instruct the jury that the evidence could not be used for an improper purpose. For these reasons, we conclude that the trial court did not abuse its discretion in permitting the evidence of prior allegations of sexual abuse involving Monique.

### C. CONCLUSION

The trial court did not err when it permitted the prosecution to present evidence about allegations of prior sexual abuse in defendant's household and to present evidence that defendant's children had been involved in prior accidental overdoses. But the trial court erred when it permitted the prosecution to elicit detailed testimony about specific allegations of physical abuse by defendant against her children. The evidence of allegations Monique made that resulted in investigations of defendant by protective services personnel was relevant to show that defendant had a motive to harm or kill Monique. However, the danger of unfair prejudice ensuing from detailed testimony into specific allegations and the allegations involving defendant's other children substantially outweighed the potential probative value of the evidence to show motive. Therefore, the trial court abused its discretion when it permitted

this testimony. Further, given the nature of this case, we cannot conclude that this error was harmless.

## VII. GENERAL CONCLUSIONS

The trial court abused its discretion when it prevented defendant's daughter and expert psychologist from offering testimony about defendant's limited intellectual capabilities for the sole purpose of explaining defendant's behavior and statements. The trial court also abused its discretion when it precluded defendant from offering the testimony of a toxicologist.

The trial court did not err when it permitted the prosecution to present evidence of prior overdoses by defendant's children and evidence concerning prior and recent allegations of sexual abuse against Monique and defendant's experiences with the investigations into the abuse. However, the trial court erred when it permitted the introduction of detailed evidence concerning specific acts of physical abuse defendant allegedly committed against her children to show malice, intent, or absence of mistake or accident. Further, although the trial court correctly determined that the evidence that defendant had been investigated because of allegations of physical abuse was relevant to prove motive, the trial court erred when it permitted the prosecution to present detailed evidence of the specific instances of abuse.

Finally, the trial court did not err when it permitted the admission of Sarmiento's recorded testimony and did not err when it permitted Virani to offer his opinion about the likelihood that a child of Monique's age would commit suicide.

Because the identified errors were not harmless, defendant is entitled to a new trial. Therefore, we reverse defendant's convictions, vacate her sentence,

and remand for a new trial that is consistent with this
opinion. We do not retain jurisdiction.