*If this opinion indicates that it is "FOR PUBLICATION," it is subject to
revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

        Plaintiff-Appellee,

v

MARK ANTHONY JAMES,

        Defendant-Appellant.

UNPUBLISHED
March 19, 2025
9:41 AM

No. 367048
Kent Circuit Court
LC No. 22-002366-FH

Before: M. J. KELLY, P.J., and BORRELLO and RICK, JJ.

PER CURIAM.

Defendant, Mark James, appeals by right his bench-trial conviction of assault with intent to do great bodily harm less than murder, MCL 750.84. We affirm for the reasons stated in this opinion.

## I. BASIC FACTS

This case arose from a physical altercation between Jacqueline Abdullah and James. At the time, James was providing "caretaking services" to Jerry Hogan. He was also absconding from parole. Abdullah, who was homeless, was at Hogan's house on the night of February 1, 2022. According to James, everyone at Hogan's house was drinking alcohol and smoking crack cocaine. At some point, James and Abdullah got into an altercation over a lighter.

According to Abdullah, during the argument, James grabbed a knife from the kitchen and went "ballistic," trying to kill her. She described him as being in a "rage." She recounted that he grabbed her, pushed her against the wall, and repeatedly tried to stab her head, face, and neck. She fought back and screamed, "no stop." James slammed her to the ground, pinned her with his knee, and continued to try to stab her. He also punched her repeatedly. Abdullah was able to grab the blade of the knife and break it, but she cut her fingers in the process. Abdullah held the blade to James's neck, told him that she did not want to kill him, and ordered him to get off her. She then threw the blade across the room.

Abdullah recalled that during the altercation, Hogan kept telling James to get off her. After the assault, she had James call his mother so that she could pray for her son. Later that night, a

-1-

male associate of Abdullah's came to the apartment to deliver "street justice" for her. Afterward, James gave Abdullah approximately $200. She claimed that she did not ask for the money. Abdullah testified that she stayed overnight at Hogan's house even though James was still there. Days later, she went to the hospital because she thought she might be getting an infection in her hand. And, eventually, she reported the assault to the police. She stated it was because she was scared and uncomfortable after seeing James in public.

Although Hogan's initial statement to the police corroborated Abdullah's version of events, he testified at trial that it was Abdullah, not James, who grabbed the knife and began the assault. He admitted to talking to both James and James's mother before trial, but denied that they had done anything to influence his testimony.

James also placed the blame for the start of the fight upon Abdullah. He recounted that he had purchased a new lighter for Abdullah. Later that night, he asked her to share a lighter and, because, she had four lighters, he took one from her. He stated that that had made her mad and she "struck" him with a beer. She then got a knife, so he "came at her" to try and get it. Once he had the knife, she grabbed the blade with her hand. And, while they were "wrasslin' over the knife," it broke. He denied trying to stab or kill Abdullah. James explained that if he had wanted to "stab her or hurt her, she couldn't stop" him because he was "a tall, 6'1" black man" who weighed 200 pounds.

James testified that after the knife broke, he helped Abdullah up and calmed her down. He invited her to drink more alcohol and smoke more crack cocaine with him. He also recalled that a man with Abdullah told him to give Abdullah some money "and we'll call this even." The man had a gun in his waistband. James gave Abdullah approximately $200 that he received from his mother and around $200 in crack cocaine. He explained that although he did not initiate the assault, he told Abdullah not to call the police because he had absconded from parole and would get into trouble. He felt that no one would call the police if he kept giving "dope and alcohol." For a couple of days after the assault, everyone at Hogan's house—including Abdullah—stayed up "getting high, drinking and smoking." When he next saw Abdullah, she wanted more money and "dope" and told him that she would call the police if he did not give it to her. He testified that when he refused, she called the police and got him into trouble. In support of his version of events, he pointed out that Abdullah did not call the police or go to the doctor until five days after the assault.

In addition to Abdullah's testimony, the prosecutor presented testimony from one of James's ex-girlfriends. She testified that in August 2015 James wanted to use her cellular phone but she did not let him. She stated that James got angry, chased her, took her phone, and then "started jumping on me and hitting me." He used a closed fist and punched her face and head three or four times. She stated that although she tried to defend herself she was unsuccessful because "he's a big guy." When asked if a knife was involved, she said "no," but added that James had tried to stab her on a different occasion. She called the police and James was arrested. James admitted to the police that he "went into a rage and hit" her multiple times.

At trial, James admitted to assaulting his former girlfriend in 2015. He stated that before the assault, they had been drinking alcohol and smoking crack. On additional questioning from the prosecutor, he admitted that in 2018, he physically assaulted another woman. Before that

assault, they were drinking and "drugging." James admitted that the woman alleged that he assaulted her with a stick. And, when she fell to the ground, he began to punch and kick her before poking at her neck with a knife. He stated, however, that it was "not true." Instead, he had assaulted her by striking her two or three times. He again explained that if he were to "beat a woman" she would be hospitalized and in "serious trouble" because he was a big man.

James stated that, unlike the women he had assaulted in 2015 and the 2018, this incident was "all about drugs, extortion and getting money" from him. He explained that he had been with the other women for years, but that he did not even know Abdullah. He described her as "a total stranger" and stated that he did not have a "right to just beat her up for no reason." In contrast, he explained that if they were together he would probably have had a reason to beat her up "if she would have did something wrong." He added that the other two women "were doing things that made [him] upset." And it had taken "time" for him to "jump on 'em." James stated that he was not going to beat someone to death because they "poured beer on [him]."

## II. OTHER-ACTS EVIDENCE

### A. STANDARD OF REVIEW

James argues that the trial court abused its discretion by admitting testimony from his ex-girlfriend under MRE 404(b). Review of a trial court's decision to admit evidence under MRE 404(b) is reviewed for an abuse of discretion. *People v Crawford*, 458 Mich 376, 383; 582 NW2d 785 (1998). "A trial court abuses its discretion when it chooses an outcome that is outside the range of reasonable and principled outcomes." *People v Orr*, 275 Mich App 587, 588-589; 739 NW2d 385 (2007).

### B. ANALYSIS

At the time of this trial, MRE 404(b)(1) provided:[1]

> Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, scheme, plan, or system in doing an act, knowledge, identity, or absence of mistake or accident when the same is material, whether such other crimes, wrongs, or acts are contemporaneous with, or prior or subsequent to the conduct at issue in the case.

In order for evidence to be admissible under MRE 404(b) it must be (1) offered for a proper purpose, (2) relevant, and (3) its probative value must not be substantially outweighed by the danger of unfair prejudice. *Crawford*, 458 Mich at 385.

---

[1] Our Supreme Court substantially amended the Michigan Rules of Evidence on September 20, 2023, effective January 1, 2024. See ADM File No. 2021-10, 512 Mich lxiii (2023). This opinion relies on the version of the rules in effect at the time of trial.

The first step in the inquiry, therefore, is whether the prosecution "has articulated a proper noncharacter purpose" for admission of evidence that the defendant committed a prior bad act. *Id*. at 385-386. In this case, the prosecution provided a laundry list of permissible purposes for the evidence, asserting that it was being offered to show identity, intent, lack of accident or mistake, to disprove self-defense, and to show that James had a plan, system, or scheme. Each of the recited purposes are proper, noncharacter purposes for which other-acts evidence may be deemed admissible. See MRE 404(b).

However, "[m]echanical recitation of knowledge, intent, absence of mistakes, etc., without explaining how the evidence relates to the recited purposes, is insufficient to justify admission under MRE 404(b)." *Id*. at 386.

> Relevance is not an inherent characteristic, nor are prior bad acts intrinsically relevant to "motive, opportunity, intent, preparation, plan," etc. Relevance is a relationship between the evidence and a material fact at issue that must be demonstrated by reasonable inferences that make a material fact at issue more probable or less probable than it would be without the evidence. [*Id*. at 387 (quotation marks and citations omitted).]

"The relationship of the elements of the charge, the theories of admissibility, and the defenses asserted governs what is relevant and material." *People v Sabin (After Remand)*, 463 Mich 43, 69; 614 NW2d 888 (2000). It is the trial court's duty to "vigilantly weed out character evidence that is disguised as something else." *Id*. at 388. The court in this case, however, undertook no such vigilant inquiry into the relevance of the evidence to each of the "proper purposes" recited by the prosecution.

We first consider the prosecution's contention that the other-acts evidence is logically relevant to prove identity. Identity is an element of every offense. *People v Yost*, 278 Mich App 341, 356; 749 NW2d 753 (2008). However, it was unrefuted that James and Abdullah engaged in a physical altercation. The disputed issue was whether it was James or Abdullah who initiated the altercation. Thus, evidence that James was fighting Abdullah would not have been indicative of James's guilt or innocence and would not have shed light on any material point. That is, given that identity was an unrefuted element, identity was not "truly in issue[.]" See *People v Denson*, 500 Mich 385, 401; 902 NW2d 306 (2017). Likewise, the other-acts evidence was not relevant to proving lack of accident or mistake given that neither is an element of the charge brought against James and given that he was not raising a defense of accident or mistake. See *Sabin*, 463 Mich at 69 (holding that other-acts evidence is not relevant under a theory of absence of mistake when that is not a defense raised by the defense).

The prosecution contends that the evidence was relevant and admissible to show that James was acting under a common plan or scheme. "[S]omething more than 'mere similarity' between the charged and uncharged conduct is required to prove a common scheme, plan, or system: there must be such a concurrence of common features that the various acts are naturally to be explained as caused by the general plan of which they are the individual manifestations." *Id*. at 64-65 (quotation marks, citation, and emphasis omitted). "To establish the existence of a common design or plan, the common features must indicate the existence of a plan rather than a series of similar spontaneous acts . . . ." *Id*. at 65-66. Here, the common features between the other acts and the

charged act are that James was consuming alcohol and drugs with a woman, he got into a dispute with her over a physical object, and he responded to the argument by physically assaulting her. That similarity is indicative of a similar spontaneous act, not the existence of a plan to physically assault women who make him angry while he is under the influence of illicit substances.

Next, the prosecution maintains the evidence is relevant and admissible to show James's "intent." The prosecution contends that in each incident the situation escalated "extremely quickly," with James going into a rage against the women. According to the prosecution "[t]his instant rage" demonstrates "an emerging pattern that [James's] intent was to harm each of the women when faced with a disagreement about the possession of an item." This argument, however, ventures too close to the forbidden propensity argument. Essentially, the crux of the argument is that James has a propensity to angrily, violently, and suddenly physically assault women when faced with a disagreement with them.

In sum, although the prosecution provided a laundry list of permissible purposes for the evidence, we conclude that the evidence was not relevant and admissible under any of the theories recited. The trial court, therefore, abused its discretion by admitting the evidence.

Reversal based upon the erroneous admission of evidence is not required "unless it affirmatively appears that, more probably than not, it was outcome determinative—i.e., that it undermined the reliability of the verdict." *Denson*, 500 Mich at 409 (quotation marks and citation omitted). The focus is "on the nature of the error" and "its effect in light of the weight and strength of the untainted evidence." *Id*. at 409-410 (quotation marks and citation omitted). Generally, "[w]hen a defendant's subjective character is used as proof of conduct on a particular occasion, there is a substantial danger that the jury will overestimate the probative value of the evidence." *Id*. at 410 (quotation marks, alterations, and citation omitted). Indeed, "[t]he risk is severe that the jury will use the evidence precisely for the purposes that it may not be considered, that is, as suggesting that the defendant is a bad person, a convicted criminal, and that if he did it before he probably did it again." *Id*. (quotation marks and citation omitted).

James, however, was not tried before a jury. Instead, he elected to be tried by the court. "Unlike a jury, a judge is presumed to possess an understanding of the law, which allows him to understand the difference between admissible and inadmissible evidence . . . ." *People v Wofford*, 196 Mich App 275, 282; 492 NW2d 747 (1992). In this case, the trial court's factual findings indicate that it found Abdullah's testimony credible. As noted above, she testified that following an argument with her, James grabbed a knife and attacked her. She had what appeared to be cuts on her neck and her fingers. She recounted him striking her multiple times, knocking her to the ground, and continuing to assault her. Her testimony was corroborated by Hogan's initial statement to the police. The court did not find his trial testimony stating that Abdullah was the initial aggressor to be credible. Although the court considered the other-acts evidence, it did not use it to draw an inference that James had a propensity to physically assault women when he got mad. Rather, the court limited its use to examining James's testimony that he did not want to hurt Abdullah and was just trying to get the knife away from her. In light of the properly admitted evidence and the fact that the court did not draw a forbidden inference from the other-acts evidence, the error in admitting the other-acts evidence is not outcome determinative.

## III.  OPINION TESTIMONY

### A.  STANDARD OF REVIEW

James next argues that the trial court improperly admitted the opinion testimony of Cody Bechaz, the officer who took Abdullah's report about the assault.  James did not object to the testimony at trial.  Accordingly, we review this unpreserved issue for plain error affecting James's substantial rights.  See *People v Carines*, 460 Mich 750, 763; 597 NW2d 130 (1999).

### B.  ANALYSIS

Officer Bechaz testified that he saw Abdullah's injuries and took photographs of them.  He further testified that—on the basis of his training and experience—the injuries "could be" consistent with grabbing a blade or being cut by one.  This was admissible opinion testimony under MRE 701, which provides:

> If the witness is not testifying as an expert, the witness' testimony in the form of opinions or inferences is limited to those opinions or inferences which are (a) rationally based on the perception of the witness and (b) helpful to a clear understanding of the witness' testimony or the determination of a fact in issue.

Generally, a police officer may provide lay opinion testimony on matters within his or her personal knowledge and experience.  See *People v Oliver*, 170 Mich App 38, 50-51; 427 NW2d 898 (1988).  Here, Officer Bechaz's testimony was rationally based upon his perception of Abdullah's injuries and it was helpful to an understanding of whether Abdullah did or did not have a cut on her fingers.  As a result, it was admissible under MRE 701.  And because the evidence was properly admitted, James's lawyer did not provide constitutionally deficient assistance by failing to object to the testimony.  See *People v Ericksen*, 288 Mich App 192, 208; 793 NW2d 120 (2010) ("Failing to advance a meritless argument or raise a futile objection does not constitute ineffective assistance of counsel.").

## IV.  CUMULATIVE ERRORS

Finally, James argues that each of the errors in this case, taken alone, constitutes error requiring reversal.  But, even assuming the errors do not individually constitute grounds for reversal, the cumulative nature of the errors denied him a fair trial, requiring reversal.  However, given that this is not a case involving multiple errors, reversal on the basis of cumulative error is not warranted.  See *People v LeBlanc*, 465 Mich 575, 591 n 12; 640 NW2d 246 (2002).

Affirmed.

/s/ Michael J. Kelly
/s/ Stephen L. Borrello
/s/ Michelle M. Rick