*If this opinion indicates that it is "FOR PUBLICATION," it is subject to
revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

        Plaintiff-Appellee,

v

DEMETRIUS IVORY, also known as DEMETRIUS
NMN IVORY,

        Defendant-Appellant.

UNPUBLISHED
June 01, 2026
2:00 PM

Nos. 362330; 362331
St. Joseph Circuit Court
LC Nos. 19-023167-FC; 19-
      023168-FC

Before: SWARTZLE, P.J, and K. F. KELLY and YOUNG, JJ.

PER CURIAM.

In this consolidated appeal,[1] in Docket No. 362330, Demetrius Ivory, appeals by right from his jury-trial convictions of five counts of first-degree criminal sexual conduct ("CSC-I") involving two minors. In Docket No. 326331, Ivory appeals by right from his jury-trial convictions of five other counts of CSC-I involving a third minor. The trial court sentenced Ivory to serve concurrent prison terms of 25 to 40 years for each count.

After oral argument on appeal, we remanded this case to the trial court for a *Ginther*[2] hearing to determine whether defendant received ineffective assistance of trial counsel. After holding the hearing, the trial court determined that Ivory's trial counsel did, in fact, perform below an objective standard of reasonableness, but that Ivory was not prejudiced by the deficient performance. On appeal after remand, we agree with the trial court that trial counsel's performance was deficient, but we further conclude that Ivory was, indeed, prejudiced. Accordingly, we reverse the trial court and remand for further proceedings.

---

[1] *People v Ivory*, unpublished order of the Court of Appeals, entered August 4, 2022 (Docket Nos. 362330 & 362331).

[2] *People v Ginther*, 390 Mich 436, 443; 212 NW2d 922 (1973).

## I. FACTS AND PROCEDURAL HISTORY

### A. FACTS

Ivory and Donna McWatters-Ivory met in 2014 at work. They began a relationship sometime in 2016 and moved in together. In 2020, the couple married.

McWatters-Ivory regularly watched her grandchildren at the home she shared with Ivory. Two of her granddaughters, SA and DA, visited about three times a month. SA testified that McWatters-Ivory would leave her alone with Ivory on occasion. SA testified that sometime in 2018, Ivory touched a private part she called the "back potty," and she testified about "kissing somebody on the lips." When asked for more detail on the touching, SA replied "mostly the lips, only the lips" but later answered "yes" when asked if Ivory's private part went inside her private part. SA described her private part feeling "sad and painful" for "about seven hours" after this incident occurred. SA testified at various times that the assault happened once, approximately five times, or even every time she went to Ivory's house. The last time SA saw Ivory she was six years old and, at the time of trial, when she was nine, she could not identify Ivory in the courtroom.

DA is SA's younger sister. SA testified to having observed DA crying while Ivory was "standing and doing the thing . . . s-e-x[,]" which would have occurred when DA was about 4-years-old or younger. DA agreed when asked whether Ivory had "used his front private part to touch [her] back private part." DA described it as "laying on the bed . . . looking at the bed . . . putting his private on my back private." She could not recall what it felt like or whether she cried or not. This happened one time and "no other times." DA did not tell anyone about these incidents until she spoke to Diana Vescoso, a registered nurse and a sexual assault nurse examiner (SANE) before trial; after DA provided her testimony, she shared at trial that "you guys are the second one who I told now." DA likewise could not identify Ivory in the courtroom.

EA is SA and DA's cousin and another granddaughter of McWatters-Ivory. EA would visit her grandmother's house about once a month until EA's family moved to a different city. EA testified her grandmother would go to work "everyday" and "every time grandma left," Ivory touched her "front private part" with "his front [private part]," in her grandmother's bedroom. She testified further that Ivory did the "nasty stuff" to her while she was laying on her stomach and he was on her back, and that "it felt weird" and "hurted." Sometime in 2019, after they moved, EA told her mother that Ivory had "penile to anal" contact with her. She also shared that something similar happened to SA. (SA had earlier testified that she saw EA in the bedroom with Ivory; EA was face down on the bed, crying, trying to lift her head to breathe. He told SA to get out.) EA and her mother identified Ivory in the courtroom but testified that his hair looked different.

After learning about the allegations from EA, EA's mother called McWatters-Ivory first, then the police. McWatters-Ivory did not believe the allegations and testified that EA's mother did not like Ivory. EA's mother would receive money from McWatters-Ivory "maybe once a month," sometimes more, and Ivory wanted the payments to stop. Just before the allegations came to light, Ivory had purchased McWatters-Ivory some expensive jewelry, and McWatters-Ivory thought her daughter was upset about that as well.

After EA's mother called McWatters-Ivory, McWatters-Ivory called SA and DA's mother. SA and DA had never come to their mother with any issues regarding McWatters-Ivory or Ivory. But after hearing the allegations that EA made, SA and DA's mother "started talking to [SA] and was like did this happen, and she told me yes." DA never told her mother anything. When her mother confronted her directly, asking if anything had happened with Ivory, DA said she did not know. At one point, after SA and DA's mother learned of the allegations, she messaged McWatters-Ivory on Facebook and said that she believed EA's mom had coached her daughter, SA, into making the allegations.

Months after EA's mother called the police, EA's mother took EA to an interview at the Children's Assessment Center. In June of 2019, when EA was six-and-a-half years old, Dr. Stephen Guertin physically evaluated EA and found no signs of acute injury. Dr. Guertin did note a suspicious finding on EA's hymen but also noted that EA and her mother reported exclusively anal penetration of EA. The prosecutor would later revisit this "suspicious" finding repeatedly in closing, emphasizing it "could be a sign of sexual abuse."

In September 2021, then-9-year-old SA and then-6-year-old DA were evaluated by child sexual abuse expert, Dr. Sarah Brown. Dr. Brown was not the girls' regular physician and did not request their medical records. According to Dr. Brown, "the purpose of the meeting [was] that the girls had reported they had been sexually abuse[d] and I was providing them with medical care." In a post-trial hearing, appellate counsel would clarify that "there is no ambiguity that these children went to go see Dr. Brown at the request of [the prosecutor]," noting that the front of the report expressly stated that the girls were being seen because the prosecutor "requested the consultation." Dr. Brown's final report was sent only to the prosecutor.

Dr. Brown was assisted by Vescoso. DA disclosed to Vescoso that "[Ivory] stuck his front part in my back part," but a complete physical exam of DA was not possible. Dr. Brown attributed that to the exam triggering "memories of things that have happened to them, others just feel exposed and vulnerable." Dr. Brown was told that SA reported penile-to-vaginal area contact as well as penile-to-anal area contact, and Dr. Brown did observe focal area narrowing of SA's hymen but could not draw any conclusions from this. Dr. Brown testified that 95% of those reporting sexual abuse show no physical signs and the "biggest reason is that both kids and adults usually delay in talking about what's happened to their body until they feel safe." The physician testified over objection that it is not likely that a grown man would fully penetrate a child's vagina, but even to put pressure on the surface of the hymen would "violate the plane of the body" sufficient to amount to first-degree criminal sexual conduct.

The prosecutor asked Dr. Brown for her diagnoses for SA and DA, to which Dr. Brown replied, "I have been instructed legally that there are concerns about me giving diagnosis in court . . . there are areas of the legal system who objects to me doing so." Dr. Brown was willing to provide her "secondary" diagnoses of "intense nightmares" for SA and sensory-processing issues and posttraumatic stress disorder for DA. Dr. Brown's CV, which was admitted at trial, reflected no training in psychiatry or psychology. The prosecutor would revisit these secondary diagnoses in closing, for example, asking the jury whether SA had nightmares from scary movies or from sexual abuse.

In 2021, police received two letters reporting additional questionable circumstances between Ivory and the young girls. These were allegations from McWatters-Ivory and her mother, Donna,[3] neither of whom had previously reported these incidents. McWatters-Ivory testified to seeing Ivory in the living room with EA, and EA's "legs [were] out of her onesie pajamas, [and EA was] bent over the couch," with Ivory behind her. On a separate occasion, McWatters-Ivory saw Ivory hug EA and tell her, "You're my new girlfriend." These events took place sometime in 2017 or 2018 and McWatters-Ivory had forgotten them until years later.

For her part, Donna recalled coming home for a book and seeing SA in the bedroom with Ivory. SA's legs were "propped up. [Ivory] was bending over her. [Donna] couldn't see if she had her pants on or off." SA was playing with Ivory's phone. Donna never told anyone what she saw and did not report these observations to police. She wrote a letter in mid-2021, around the same time as her daughter belatedly came forward with unreported observations of Ivory with the children. She testified that her daughter typed the letter for her, but she dictated it.

Ivory testified on his own behalf, in which he denied the allegations and provided alternative explanations for the events that McWatters-Ivory and Donna witnessed. Ivory claimed that when he was left alone with the girls, they played with their toys while he played video games in the living room. Ivory stated that he interacted with the children primarily when they asked him for something to eat or drink, but he would occasionally spank them as a form of discipline.

Perhaps because of what was learned in pretrial discovery, trial counsel initially included on the defense witness list Dr. Daniel Swerdlow-Freed, an expert in child memory, suggestibility, misattribution, and forensic-interview protocols. Trial counsel did not, however, consult with Dr. Swerdlow-Freed before trial or call him at trial. Trial counsel did call Dr. Marcus DeGraw, M.D., an expert in "child abuse pediatrics," who testified that the children's physical examinations displayed "variants" but were otherwise normal and not necessarily indicative of sexual abuse.

## B. PROCEDURAL HISTORY

In each lower court case, Ivory was convicted of five counts of CSC-I, MCL 750.520b(2)(b) (victim under 13 years of age, perpetrator over 17 years of age), and sentenced to serve concurrent prison terms of 25 to 40 years for each count. Ivory subsequently filed a post-judgment motion for a new trial and *Ginther* hearing, raising issues regarding ineffective assistance of counsel, prosecutorial misconduct, and DA's competence to testify. Ivory also moved the trial court for public funds to pay for an expert in forensic interviewing, suggestibility, and memory taint. After briefing and oral arguments, the trial court denied both motions, and this appeal followed. After reviewing the briefs and hearing oral argument, we remanded for a *Ginther* hearing on defendant's claim of ineffective assistance of counsel.

On remand, the trial court held an evidentiary hearing over several days and heard from trial counsel as well as Dr. Katherine Jacobs, a clinical psychologist specializing in childhood adolescence, memory, and suggestibility. Dr. Jacobs' testimony was two-fold: 1) it refuted large

---

[3] Mother and daughter share the same first name. To avoid confusion, we refer to the daughter by her married last name (McWatters-Ivory), and we refer to the mother by her first name (Donna).

-4-

portions of Dr. Brown's trial testimony and secondary diagnoses and 2) it called into question the interviewing techniques used when interviewing the minors in this case, specifically addressing the dearth of information on source monitoring (identifying where each child got the information she is providing). Dr. Brown testified again at the *Ginther* hearing as well. In December 2025, following briefing, the trial court issued its oral opinion. The trial court held that Ivory's trial counsel performed deficiently in three distinct ways:

1) Trial counsel should have objected to the testimony of Dr. Brown and the SANE. As the trial court stated, "I don't feel Dr. Brown should have been allowed to testify, or the nurse. Those [examinations] were clearly not for medical purposes." The trial court went on to observe that Dr. Brown and the SANE did not add anything factually to the record but "may have been bolstering" to the children's testimony because the doctor and nurse had "more detailed and better testimony than the children had."

2) Trial counsel failed to attack the foundation of Dr. Brown's testimony. Specifically, the trial court found that Dr. Brown's testimony regarding secondary diagnoses was without foundation: "[S]he had not provided a foundation for any expertise in mental health, psychiatry, or psychology."

3) Finally, the trial court concluded that trial counsel should have consulted an expert on child forensic interviewing and memory.

Despite trial counsel's deficient performance, the trial court determined that such performance was not so prejudicial as to amount to ineffective assistance of counsel:

I can't find there's a reasonable probability that without the attorney's mistakes the result would have been different to the point where he would have been found not guilty. I can't say that and I don't know what it would have been. . . . I also find that taking those errors away from the evidence presented to the jury would have allowed a reasonable juror to find as they did based on the testimony that was admitted and that's my ruling.

The case subsequently returned to this Court, and the parties provided supplemental briefing on the question of ineffective assistance of counsel. The matter is now ripe for resolution, and further oral argument is not needed.

## II. INEFFECTIVE ASSISTANCE OF COUNSEL

### A. STANDARD OF REVIEW

Defendant argues that he received ineffective assistance of counsel, guaranteed to him under the U.S. Constitution, Am VI, and the 1963 Michigan Constitution, art 1, § 20. To establish ineffective assistance of counsel, defendant must show *both* 1) that his counsel's performance fell below an objective standard of reasonableness, and 2) that there is a reasonable probability that, but for counsel's error, the result of the proceedings would have been different. *Smith v Spisak*, 558 US 139, 149; 130 S Ct 676; 175 L Ed 2d 595 (2010); *People v Trakhtenberg*, 493 Mich 38, 51; 826 NW2d 136 (2012).

"A claim of ineffective assistance of counsel is a mixed question of law and fact." *People v Petri*, 279 Mich App 407, 410; 760 NW2d 882 (2008). "A trial court's findings of fact, if any, are reviewed for clear error, and this Court reviews the ultimate constitutional issue arising from an ineffective assistance of counsel claim de novo." *Id*. "Clear error exists when the reviewing court is left with the definite and firm conviction that a mistake has been made." *People v Anderson*, 284 Mich App 11, 13; 772 NW2d 792 (2009) (quotation marks and citation omitted). The denial of a motion for new trial is reviewed for an abuse of discretion. *People v Loew*, 514 Mich 158, 173; 22 NW3d 323 (2024).

### B. OBJECTIVE STANDARD OF REASONABLENESS

The trial court correctly concluded that Ivory's trial counsel performed below an objective standard of reasonableness, and we agree with the trial court's reasoning on this prong. Briefly, both Dr. Brown and the SANE testified about what the complainants told them during their respective examinations. This would ordinarily amount to hearsay, i.e., "a statement, other than the one made by the declarant while testifying at [a] trial or hearing, offered in evidence to prove the truth of the matter asserted." MRE 801(c).[4] Hearsay is generally not admissible, save for certain exceptions provided by the Michigan Rules of Evidence. MRE 802; *People v Propp*, 508 Mich 374, 386; 976 NW2d 1 (2022). "Exceptions to the hearsay rule are justified by the belief that the hearsay statements are both necessary and inherently trustworthy." *People v Meeboer (After Remand)*, 439 Mich 310, 322; 484 NW2d 621 (1992).

MRE 803(4) provides an exception for "[s]tatements made for purposes of medical treatment or medical diagnosis in connection with treatment and describing medical history, or past or present symptoms, pain or sensations, or the inception or general character of the cause or external source thereof insofar as reasonably necessary to such diagnosis and treatment." "The rationale for MRE 803(4) is the existence of (1) the self-interested motivation to speak the truth to treating physicians in order to receive proper medical care, and (2) the reasonable necessity of the statement to the diagnosis and treatment of the patient." *People v Duenaz*, 306 Mich App 85, 95; 854 NW2d 531 (2014) (quotation marks and citation omitted). When, as in this case, children are the hearsay declarants, their "understanding to tell the truth may not be as apparent as it is with adults[.]" *Meeboer*, 439 Mich at 326. Factors related to trustworthiness guarantees surrounding the actual making of the statement include:

> (1) the age and maturity of the declarant, (2) the manner in which the statements are elicited (leading questions may undermine the trustworthiness of a statement), (3) the manner in which the statements are phrased (childlike terminology may be evidence of genuineness), (4) use of terminology unexpected of a child of similar age, (5) who initiated the examination (prosecutorial initiation may indicate that the examination was not intended for purposes of medical diagnosis and treatment), (6)

---

[4] The Michigan Rules of Evidence were substantially amended on September 20, 2023, effective January 1, 2024. See 512 Mich lxiii (2023). This opinion relies on the version of the rules in effect at the time of trial. See *In re Guardianship of Brosamer*, 328 Mich App 267, 272 n 1; 936 N.W.2d 870 (2019) ("All references in this opinion to the statute are to the version in effect when the trial court issued its order.").

the timing of the examination in relation to the assault (the child is still suffering pain and distress), (7) the timing of the examination in relation to the trial (involving the purpose of the examination), (8) the type of examination (statements made in the course of treatment for psychological disorders may not be as reliable), (9) the relation of the declarant to the person identified (evidence that the child did not mistake the identity), and (10) the existence of or lack of motive to fabricate. [*Id*. at 324-325 (citations omitted).]

Given the record before us, these factors overwhelmingly counsel against admission of the testimony of Dr. Brown and the SANE. SA and DA were relatively young, and they came forward only after direct confrontation by their mother. While their terminology was age appropriate, the examinations took place at the direction of the prosecutor, years after the alleged sexual encounters and months after the initial report to police from EA; no medical purpose was served by these examinations whatsoever. Although not the most compelling motive to fabricate a sexual assault, there was some testimony on the record that the children may have lied about Ivory on behalf of their parents, to get back at Ivory for purchasing expensive jewelry for McWatters-Ivory while also halting financial contributions to EA's family. More importantly, there were legitimate concerns about coaching. Finally, the inconsistencies among the various statements should have been cause for concern as to the trustworthiness of the reporting. The testimony of Dr. Brown and the SANE recounting the statements of SA and DA was clearly inadmissible hearsay, and trial counsel should have objected or otherwise sought exclusion on that basis.

Relatedly, we agree with the trial court that Ivory's trial counsel performed deficiently when he failed to object to or otherwise preclude Dr. Brown's secondary diagnoses of SA with intense nightmares and DA with sensory-processing issues and signs of posttraumatic stress disorder. There is no record evidence that Dr. Brown had the education or training in psychology or psychiatry that would qualify her to make such diagnoses. Our Supreme Court has concluded that "an examining physician's opinion is objectionable when it is solely based on what the victim told the physician." *People v Thorpe*, 504 Mich 230, 262; 934 NW2d 693 (2019) (quotation marks and citation omitted). Here, while Dr. Brown refrained from opining on whether the complainants had been sexually assaulted, she did offer unqualified diagnoses that strongly implied the girls suffered ongoing disorders from past traumas, and the only traumas alleged were those attributed to Ivory. In short, Dr. Brown testified about diagnoses that she was unqualified to make, and these secondary diagnoses practically amounted to an opinion on whether complainants were telling the truth.

With respect to the third way trial counsel performed deficiently, the trial court correctly observed that counsel should have consulted, and likely called as a witness, an expert in forensic interviewing, suggestibility, and memory taint that would have aided the jury in evaluating the credibility of the complainants. From the outset of trial, the defense strategy was to challenge the reliability of the complainants' disclosures of sexual abuse, and this strategy was one in which expert testimony, or minimally an expert consultation pre-trial, could have been critical.

For example, in both the opening statement and closing argument, trial counsel asked the jury to consider the reliability of the children's testimony, and counsel suggested various factors that might raise red flags when assessing reliability, such as inconsistencies in testimony, delayed disclosures, and the circumstances under which the disclosures were made. Trial counsel noted at

one point that EA gave inconsistent statements three weeks apart and was not forensically interviewed until months after her disclosure, and that DA said at her first forensic interview that nothing happened and provided few additional responses. He suggested that it was incredible that within a span of one to two hours, Ivory sexually assaulted all three girls, yet none of them said anything to their grandmother when she returned home. He also reminded the jury that SA testified that the abuse happened once, then she said that it happened five times, and then she asserted that it happened every time that she was at Ivory's home.

Consistent with his trial strategy, trial counsel elicited testimony that put pressure on the reliability of the complainants' allegations, such as that EA was not forensically interviewed until months after her disclosure, and that McWatters-Ivory and the mother of SA and DA thought at one time that EA's mother had coached her and that "it was a set up." Trial counsel also asked questions that suggested alternate motives for the disclosures, suggesting that EA's parents might have had a financial motive, and that McWatters-Ivory might have written her letter to the police to heal the family rift so that she could see her grandchildren again. Trial counsel elicited testimony from Dr. Brown that there was no physical evidence to support SA's disclosures. It was also obvious that trial counsel had watched the forensic interviews and knew enough about forensic-interviewing protocols to cross-examine Dr. Brown extensively about them. Trial counsel was knowledgeable about aspects of the forensic-interviewing protocol and suggestibility; so knowledgeable, in fact, that counsel originally listed an expert to consult before trial—but counsel failed to follow through on this sensible step.

Critically, trial counsel's arguments to the jury were not evidence, as the trial court properly instructed the jury. The jury had the evidence, and it had the framing of some of that evidence provided by witnesses for the prosecution like Dr. Brown and the SANE. What the jury did not have was any framing by a defense expert, and although a defense expert is not required in every CSC case, such an expert would have been particularly helpful to the jury here. As noted by the trial court on remand, trial counsel made the decision not to pursue an expert in this area without sufficient information. "[A] defense attorney may be deemed ineffective, in part, for failing to consult an expert when counsel had neither the education nor the experience necessary to evaluate the evidence and make for himself a reasonable, informed determination as to whether an expert should be consulted or called to the stand . . . ." *Trakhtenberg*, 493 Mich at 54 n 9. See also *In re Casto*, 344 Mich App 590, 618; 2 NW3d 102 (2022) (faulting trial counsel for not consulting with "an expert who could have provided valuable information on child memory, suggestibility, source misattribution, and forensic-interview protocols, all of which would have been materially useful to supporting defense's theory and assisting a fact-finder's assessment of [the child's] disclosures").

Accordingly, for these reasons, as set forth here and by the trial court on remand, we conclude that trial counsel's performance fell below an objective standard of reasonableness. Given this, we turn next to the second prong, whether defendant was prejudiced by the deficient performance.

## C. PREJUDICE

Here we part ways with the trial court, as the record confirms that trial counsel's deficient performance did prejudice defendant. The trial court recognized that the testimonies of Dr. Brown and the SANE were impactful, noting that without their testimony there was the "girls' testimony and the girls' testimony changed." The trial court concluded, however, that there was not "a reasonable probability that without the attorney's mistakes the result would have been different to the point where he would have been found not guilty."

To warrant a new trial, "defendant must show there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *People v Pickens*, 446 Mich 298, 314; 521 NW2d 797 (1994), quoting *Strickland v Washington*, 466 US 668, 694; 104 S Ct 2052; 30 L Ed 2d 674 (1984).

The three errors by counsel, taken together, undermine confidence in the outcome of these convictions. *People v Yost*, 278 Mich App 341, 413; 749 NW2d 753 (2008) (concluding that multiple expert and lay witness testimonial errors, considered cumulatively, warranted a new trial). The hearsay testimony of Dr. Brown and the SANE should not have been allowed into evidence, and that testimony bolstered the sometimes-inconsistent testimony of the girls. Dr. Brown was allowed to testify about diagnoses on which she had no training or qualifications, and this further bolstered the credibility of SA and DA, and likely generated sympathy for them. Although these errors directly involved SA and DA but not EA, the cases were consolidated for trial, and so the same jury heard the testimony of Dr. Brown and the SANE. It is likely that this testimony had an indirect bolstering effect on the case involving EA as well.

And with respect to the third and most serious deficiency—the failure to consult and likely call an expert witness on coached and/or fabricated allegations—this error impacted the charges involving all three of the girls. The testimony of the girls, to varying degrees, exhibited inconsistencies and peculiarities. An expert like Dr. Katherine Jacobs, who testified at the *Ginther* hearing below, could have offered the jury an expert perspective on various topics relevant and material to the girls' testimony, including child memory and suggestibility. Had the problematic testimony been omitted, and had that defense expert been consulted and likely called to testify, the record confirms that there is reasonable probability that, but for counsel's unprofessional errors, the result of the proceedings would have been different. Given this, the trial court abused its discretion in denying the motion for new trial on this basis.

## III. INSUFFICIENT EVIDENCE

In addition to ineffective assistance of counsel, Ivory argues on appeal that there was insufficient evidence with respect to several counts involving EA. Specifically, he maintains that there was insufficient evidence of penile-to-anal penetration of EA. Because insufficient evidence is grounds for acquittal, where double jeopardy would preclude retrial, we must also address this claim, regardless of the ineffective assistance of counsel that we have already found. See *People v Mitchell*, 301 Mich App 282, 294; 835 NW2d 615 (2013).

"This Court reviews de novo a challenge to the sufficiency of the evidence." *People v Smith*, 336 Mich App 297, 302; 970 NW2d 450 (2021). The Court reviews "the evidence in the light most favorable to the prosecution and determines whether the jury could have found each element of the charged crime proved beyond a reasonable doubt." *Id*. (quotation marks and citation omitted).

Viewed in the light most favorable to the prosecution, there was sufficient evidence of penile-to-anal penetration of EA. As the prosecutor points out, EA identified two distinct types of touching: (1) when Ivory touched her front private part with his front private part; and (2) when defendant did "the nasty stuff" while she was lying on her stomach and he was lying on her back. With respect to the second touching, EA said that it was hard to move because he was on her back, that what he was doing hurt, and that it happened every time that her grandmother would leave.

The testimonies of other witnesses also support the reasonable inference that Ivory penetrated EA anally. SA testified that she saw EA and defendant in his bedroom; EA was face down on the bed, crying and trying to get her head up for air, and defendant told SA to leave. In addition, McWatters-Ivory testified about seeing EA leaning over the couch with her legs out of her onesie, and defendant kneeling behind her. Lastly, Dr. Guertin testified that, when he examined EA, the mother informed him that EA had told her that the contact was penile-to-anal; this testimony has not been challenged on appeal.

Viewed in the light most favorable to the prosecution, the evidence was sufficient to allow a rational trier of fact to conclude that Ivory penetrated EA anally on at least four separate occasions. Therefore, Ivory is not entitled to relief on this ground.

## IV. CONCLUSION

In sum, there was sufficient evidence to support Ivory's convictions involving EA based on penile-to-anal penetration; thus, he is not entitled to an outright acquittal on those charges at this stage. Ivory did, however, receive ineffective assistance of counsel, and he is entitled to a new trial on all of the charges. Given this, we need not reach Ivory's remaining claims for new trial.

Reversed and remanded for further proceedings consistent with this opinion. We do not retain jurisdiction.

/s/ Brock A. Swartzle
/s/ Adrienne N. Young

KELLY, K.F., J. did not participate.